UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| | : | |
| v. | : | Mag. No. 18-1535 (DEA) |
| | : | |
| JAKIR TAYLOR, | : | |
| a/k/a "Jak"; | : | |
| JEROME ROBERTS, | : | |
| a/k/a "Righteous"; | : | |
| DAVID ANTONIO, | : | |
| a/k/a "Papi," | : | |
| a/k/a "Victor Arias," | : | |
| a/k/a "Pop," | : | |
| a/k/a "Santiago Ramirez"; | : | |
| OMAR COUNCIL, | : | |
| a/k/a "Stacks," | : | |
| a/k/a "Y-O," | : | |
| a/k/a "O," | : | |
| a/k/a "Snow"; | : | |
| BRIAN PHELPS, | : | |
| a/k/a "B-Money," | : | |
| a/k/a "B"; | : | |
| GARY AUSMORE, | : | |
| a/k/a "G"; | : | |
| DAVIAS TAYLOR, | : | |
| a/k/a "Vicey," | : | |
| a/k/a "Mitch"; | : | |
| ALONZO LEARY, | : | |
| a/k/a "Buck," | : | |
| a/k/a "J-Buck"; | : | |
| MAJOR ANDERSON, | : | |
| a/k/a "Maj"; | : | |
| WAYNE K. BUSH; | : | |
| TACQUES HALL, | : | |
| a/k/a "Buddha"; | : | |
| KAHLIL HAMPTON, | : | |
| a/k/a "Ruger"; | : | |
| BRANDON COUNCIL, | : | |
| a/k/a "BH"; | : | |
| SHAQUEL ROCK, | : | |
| a/k/a "Shaq"; | : | |

DENNIS CHESTON, JR.,                    :
    a/k/a "Beans";                      :
DONTE ELLIS,                            :
    a/k/a "Shalant";                    :
TIMOTHY WIMBUSH,                        :
    a/k/a "Young Money";                :
TAQUAN WILLIAMS;                        :
JUBRI WEST;                             :
MALIK BINGHAM,                          :
    a/k/a "Fresh";                      :
DEAVON WARNER,                          :
    a/k/a "Tug";                        :
JAQUAN WADE;                            :
QUIANA WELCH,                           :
    a/k/a "KiKi";                       :
KALEIB COX,                             :
    a/k/a "Lito";                       :
VARLEE KOON; and                        :
LATRICE WHARTON                         :

    I, Rachel Kolvek, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.  On or about the dates set forth in Attachment A to this complaint, in the District of New Jersey and elsewhere:

SEE ATTACHMENT A

    I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_Rachel Kolvek_

RACHEL KOLVEK
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE
OCTOBER 24, 2018
TRENTON, NEW JERSEY

_[signature]_

HON. DOUGLAS E. ARPERT
UNITED STATES MAGISTRATE JUDGE

2

ATTACHMENT A

Count One
(Conspiracy)

From at least in or around October 2017 to in or around October 2018,
in Mercer County, in the District of New Jersey and elsewhere, the defendants,

JAKIR TAYLOR, a/k/a "Jak";
JEROME ROBERTS, a/k/a "Righteous,"
DAVID ANTONIO, a/k/a "Papi," a/k/a "Victor Arias,"
a/k/a "Pop," a/k/a "Santiago Ramirez";
OMAR COUNCIL, a/k/a "Stacks," a/k/a "Y-O"; a/k/a "O"; a/k/a "Snow";
BRIAN PHELPS, a/k/a "B-Money," a/k/a "B";
GARY AUSMORE, a/k/a "G";
DAVIAS TAYLOR, a/k/a "Vicey," a/k/a "Mitch";
ALONZO LEARY, a/k/a "Buck," a/k/a "J-Buck";
MAJOR ANDERSON, a/k/a "Maj";
WAYNE K. BUSH;
TACQUES HALL, a/k/a "Buddha";
KAHLIL HAMPTON, a/k/a "Ruger";
BRANDON COUNCIL, a/k/a "BH";
MALIK BINGHAM, a/k/a "Fresh";
SHAQUEL ROCK, a/k/a "Shaq";
DENNIS CHESTON, JR., a/k/a "Beans";
DONTE ELLIS, a/k/a "Shalant";
TIMOTHY WIMBUSH, a/k/a "Young Money";
TAQUAN WILLIAMS;
JUBRI WEST;
DEAVON WARNER, a/k/a "Tug";
JAQUAN WADE;
QUIANA WELCH, a/k/a "KiKi";
KALEIB COX, a/k/a "Lito";
VARLEE KOON; and
LATRICE WHARTON,

did knowingly and intentionally conspire with each other and others known
and unknown to distribute and possess with intent to distribute one kilogram
or more of a mixture and substance containing a detectable amount of heroin,
a Schedule I controlled substance, contrary to Title 21, United States Code,
Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

Count Two
(Possession of a Firearm in Furtherance of a Drug-Trafficking Crime)

From in or around August 2018 to in or around October 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendants,

JAKIR TAYLOR, a/k/a "Jak";
TIMOTHY WIMBUSH, a/k/a "Young Money";
TAQUAN WILLIAMS;
JUBRI WEST; and
DENNIS CHESTON, JR., a/k/a "Beans,"

in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, namely, conspiracy to distribute and possess with intent to distribute heroin, as charged in Count One of this criminal complaint, did knowingly and intentionally possess one or more firearms, including but not limited to: (i) a .223 caliber semi-automatic assault rifle bearing no apparent serial number or markings as to manufacturer; (ii) a Glock 30 .45 caliber semi-automatic firearm, bearing serial number GBE230; (iii) a Smith & Wesson .40 caliber semi-automatic firearm, model SD4VE, bearing serial number FZF7667; (iv) a Glock 19 semi-automatic firearm, bearing serial number FDF181; and (v) a nine-millimeter Smith & Wesson semi-automatic firearm, model SD9VE, bearing serial number HFA8598.

In violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2.

<u>Count Three</u>
(Unlawful Possession of a Firearm By a Convicted Felon)

On or about September 6, 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendants,

TIMOTHY WIMBUSH, a/k/a "Young Money," and
TAQUAN WILLIAMS,

each having been convicted in the Superior Court of New Jersey, Mercer County, of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting commerce, firearms, namely, (i) a .223 caliber semi-automatic assault rifle bearing no apparent serial number or markings as to manufacturer; (ii) a Glock 30 .45 caliber semi-automatic firearm, bearing serial number GBE230; (iii) a Smith & Wesson .40 caliber semi-automatic firearm, model SD4VE, bearing serial number FZF7667; and (iv) a Glock 19 semi-automatic firearm, bearing serial number FDF181.

In violation of Title 18, United States Code, Sections 922(g)(1) and 2.

<u>Count Four</u>
(Unlawful Possession of a Firearm By a Convicted Felon)

On or about September 8, 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

DENNIS CHESTON, JR., a/k/a "Beans,"

having been convicted in the Superior Court of New Jersey, Mercer County, of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting commerce, a firearm, namely, a nine-millimeter Smith & Wesson semi-automatic firearm, model SD9VE, bearing serial number HFA8598.

In violation of Title 18, United States Code, Section 922(g)(1).

<u>ATTACHMENT B</u>

I, Rachel Kolvek, am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2001.  I have been involved personally in the investigation of this matter.  The information contained in this complaint is based on my personal knowledge and on information obtained from other sources, including: (i) statements made or reported by various witnesses with knowledge of relevant facts; (ii) my review of documents and evidence obtained through court orders, subpoenas, and other sources; (iii) assistance provided to law enforcement by multiple confidential sources of information deemed credible and reliable; and (iv) my review of wire and electronic communications intercepted pursuant to court-authorized wiretaps.  Because this complaint is submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation.  Where the contents of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in sum and substance and in part, and the statements set forth herein are based on preliminary summaries and quotations of those communications.

## I.   BACKGROUND

1.   From at least as early as in or around October 2017 to the present, the above-captioned defendants, and others known and unknown, combined, conspired, and agreed to distribute and possess with intent to distribute controlled substances, including at least one kilogram of heroin, in and around the City of Trenton, New Jersey, and beyond.

2.   In furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to obtain—and did obtain—significant quantities of heroin, as well as cocaine, crack cocaine, prescription pills, and other controlled substances, from multiple suppliers.  Also in furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to distribute—and did distribute—those narcotics, for profit, to other co-conspirators, various dealers, sub-dealers, and end users in and around Trenton and elsewhere.

3.   During and in furtherance of the drug-trafficking conspiracy, several co-conspirators also possessed and shared firearms.  Indeed, during the investigation, law enforcement recovered at least five firearms that several defendants possessed in furtherance of the drug-trafficking conspiracy—including at least one semi-automatic assault rifle.  Additionally, communications intercepted pursuant to court-authorized wiretaps have revealed that multiple co-conspirators possessed, shared, agreed to possess, supplied, tried to supply, or actively sought to obtain firearms to be used in furtherance of the drug-trafficking conspiracy.

4.    Indeed, during the conspiracy, a dramatic increase in gun-related violence occurred in and around the areas in which the drug-trafficking conspiracy operated.  The investigation is continuing, but based on evidence obtained to date, law enforcement believes that a significant amount of the gun violence during the conspiracy occurred as the result of an ongoing dispute between individuals aligned with the above-captioned defendants and another rival Trenton gang.

5.    Although the conspiracy operated throughout Trenton and surrounding municipalities, the conspiracy operated principally in several locations in Trenton, including Martin Luther King, Jr. Boulevard ("MLK"), Sanford Street ("Sanford"), Middle Rose Street ("Mid-Rose"), Southard Street ("Southard"), Hoffman Avenue ("Hoffman"), and Coolidge Avenue ("Coolidge"), as well as outside a local market located in or around Ewing, New Jersey.

6.    At all times relevant to this complaint:

a.    JAKIR TAYLOR, a/k/a "Jak," was a principal member of the drug-trafficking conspiracy who obtained significant quantities of heroin from defendants JEROME ROBERTS and DAVID ANTONIO, and re-distributed that heroin, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.  TAYLOR used at least two telephone facilities, one ending in 6655 (the TAYLOR 6655 Facility"), and the other ending in 7717 (the "TAYLOR 7717 Facility"), to communicate in furtherance of the conspiracy. As described herein, TAYLOR also possessed multiple firearms during and in furtherance of the conspiracy.

b.    JEROME ROBERTS, a/k/a "Righteous," was a principal member of the drug-trafficking conspiracy who obtained large quantities of heroin from multiple suppliers, including defendant DAVID ANTONIO, and another heroin supplier in or around Newark, New Jersey.  ROBERTS used at least two telephone facilities, one ending in 8686 (the "ROBERTS 8686 Facility") and the other ending in 2557 (the "ROBERTS 2557 Facility"), to communicate in furtherance of the conspiracy.

c.    DAVID ANTONIO, a/k/a "Papi," a/k/a "Victor Arias," a/k/a "Pop," a/k/a "Santiago Ramirez" (referred to hereafter as "PAPI"), was a heroin supplier who, during and in furtherance of the conspiracy, supplied significant quantities of heroin to TAYLOR and ROBERTS, as well as to defendants DAVIAS TAYLOR and VARLEE KOON.  PAPI used at least two telephone facilities, one ending in 2384 (the "PAPI 2384 Facility") and the other ending in 2190 (the "PAPI 2190 Facility"), to communicate in furtherance of the conspiracy.

     d.    OMAR COUNCIL, a/k/a "Stacks," a/k/a "Y-O," a/k/a "O," a/k/a "Snow," was a principal member of the drug-trafficking conspiracy and was an associate of TAYLOR, ROBERTS, and defendants BRIAN PHELPS, GARY AUSMORE, ALONZO LEARY, BRANDON COUNCIL, DEAVON WARNER, and others.  During the conspiracy, COUNCIL regularly distributed, for profit, controlled substances including heroin, powder cocaine, crack cocaine, Percocet, oxycodone, hydrocodone, Xanax, and others in and around the greater Trenton area.  As described below, during the conspiracy, one co-conspirator noted, in sum and substance, that COUNCIL would need to become the "MVP" of the drug-trafficking conspiracy following the arrest and federal prosecution of co-conspirator BRIAN PHELPS.  COUNCIL used a telephone facility ending in 7893 (the "COUNCIL 7893 Facility") to communicate in furtherance of the conspiracy.

     e.    BRIAN PHELPS, a/k/a "B-Money," a/k/a "B," was a principal member of the drug-trafficking conspiracy and was an associate of COUNCIL, defendants GARY AUSMORE, ALONZO LEARY, DEAVON WARNER, and others.  During and in furtherance of the conspiracy, PHELPS distributed, for profit, quantities of heroin, crack cocaine, and other narcotics. As described below, in or around January 2018, PHELPS was arrested and charged in federal court in connection with PHELPS's possession of a firearm, and has been detained on that charge since his arrest.  As noted in paragraph 5(d), above, during the conspiracy, one co-conspirator noted, in sum and substance, that if PHELPS were to be imprisoned for a considerable period of time, COUNCIL would need to step up and become "MVP" of the drug-trafficking conspiracy in place of PHELPS.

     f.    GARY AUSMORE, a/k/a "G," was a principal member of the drug-trafficking conspiracy and was an associate of COUNCIL, TAYLOR, PHELPS, defendant ALONZO LEARY, and others.  During and in furtherance of the conspiracy, AUSMORE agreed to distribute—and did distribute—heroin, prescription pills, and other narcotics, for profit, in and around Trenton. AUSMORE used a telephone facility that, during the conspiracy, was assigned two different telephone numbers, one ending in 0699 (the "AUSMORE 0699 Facility") and the other ending in 1394 (the "AUSMORE 1394 Facility"), to communicate in furtherance of the conspiracy.

     g.    DAVIAS TAYLOR, a/k/a "Vicey," a/k/a "Mitch" (hereafter referred to as "VICEY"), was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, PAPI, defendants TACQUES HALL, KAHLIL HAMPTON, SHAQUEL ROCK, and others.  During the conspiracy, VICEY obtained significant quantities of heroin from TAYLOR, PAPI, and others to re-distribute, for profit, to others in and around Trenton and elsewhere.  VICEY used a telephone facility ending in 7210 (the "VICEY 7210 Facility") to communicate in furtherance of the conspiracy.

     h.     ALONZO LEARY, a/k/a "Buck," a/k/a "J-Buck," was a member of the drug-trafficking conspiracy and was an associate of COUNCIL, AUSMORE, PHELPS, and others.  LEARY distributed heroin and prescription pills in coordination with COUNCIL and AUSMORE and in furtherance of the conspiracy.  LEARY used a telephone facility ending in 8155 (the "LEARY 8155 Facility") to communicate in furtherance of the conspiracy.

     i.     MAJOR ANDERSON, a/k/a "Maj," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, ROBERTS, COUNCIL, AUSMORE, and others.  During the conspiracy, ANDERSON obtained numerous supplies of heroin from TAYLOR and others to re-distribute, for profit, to others in and around Trenton and elsewhere. Defendant ANDERSON used at least three telephone facilities, one ending in 7419 (the "ANDERSON 7419 Facility"), one ending in 8109 (the "ANDERSON 8109 Facility"), and one ending in 0325 (the "ANDERSON 0325 Facility") to communicate in furtherance of the conspiracy.

     j.     WAYNE K. BUSH, was a member of the drug-trafficking conspiracy and was an associate of TAYLOR and others.  During the conspiracy, BUSH was incarcerated at Bayside State Prison in or around Leesburg, New Jersey, and he participated in the conspiracy while incarcerated there.  BUSH agreed to engage in significant heroin trafficking with TAYLOR upon BUSH's release from prison.

     k.     TACQUES HALL, a/k/a "Buddha," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, VICEY, and defendants KAHLIL HAMPTON and QUIANA WELCH, and others.  During the conspiracy, HALL obtained numerous supplies of heroin from TAYLOR and others to re-distribute, for profit, to others in and around Trenton and elsewhere.  HALL used a telephone facility ending in 0762 (the "HALL 0762 Facility") to communicate in furtherance of the conspiracy.

     l.     KAHLIL HAMPTON, a/k/a "Ruger," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, HALL, and others.  During the conspiracy, HAMPTON obtained supplies of heroin from TAYLOR and others to re-distribute, for profit, to others in and around Trenton and elsewhere.  HAMPTON used at least two telephone facilities, one ending in 9459 (the "HAMPTON 9459 Facility") and the other ending in 7110 (the "HAMPTON 7110 Facility") to communicate in furtherance of the conspiracy.

     m.     BRANDON COUNCIL, a/k/a "BH," was a member of the drug-trafficking conspiracy and was an associate of OMAR COUNCIL, AUSMORE, and others.  BRANDON COUNCIL communicated regularly with OMAR COUNCIL in furtherance of the conspiracy's drug-trafficking activities.

BRANDON COUNCIL used a telephone facility ending in 7401 (the "BRANDON COUNCIL 7401 Facility") to communicate in furtherance of the conspiracy.

n.     SHAQUEL ROCK, a/k/a "Shaq," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, HAMPTON, HALL, VICEY, and others.  During the conspiracy, ROCK obtained supplies of heroin from TAYLOR and others to re-distribute, for profit, to others in and around Trenton and elsewhere.  ROCK used a telephone facility ending in 3260 (the "ROCK 3260 Facility") to communicate in furtherance of the conspiracy.

o.     DENNIS CHESTON, JR., a/k/a "Beans," participated in the drug-trafficking conspiracy and was a supplier of firearms to other members of the conspiracy, including TAYLOR.  In furtherance of the conspiracy, CHESTON obtained supplies of heroin from TAYLOR to re-distribute, for profit, to others in and around the State of North Carolina and elsewhere.  As described herein, CHESTON possessed multiple firearms during and in furtherance of the drug-trafficking conspiracy, including for the purpose of distributing firearms to other members of the conspiracy in exchange for supplies of heroin.  CHESTON used a telephone facility ending in 8737 (the "CHESTON 8737 Facility") to communicate in furtherance of the conspiracy.  On or about August 30, 2004, CHESTON was convicted in the Superior Court of New Jersey, Mercer County, of a felony offense, namely, possession with intent to distribute a controlled dangerous substance within 500 feet of a school.  Accordingly, federal law prohibited CHESTON from possessing a firearm.

p.     DONTE ELLIS, a/k/a "Shalant," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, ROBERTS, and others.  During the conspiracy, TAYLOR supplied ELLIS with significant quantities of heroin for ELLIS to re-distribute, for profit, to others in and around Trenton.  As described below, in furtherance of the conspiracy, TAYLOR indicated his intent to "unleash" ELLIS in a particular Trenton neighborhood following ELLIS's release from prison.  ELLIS used a telephone facility ending in 6759 (the "ELLIS 6759 Facility") to communicate in furtherance of the conspiracy.

q.     TIMOTHY WIMBUSH, a/k/a "Young Money," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, HALL, defendants TAQUAN WILLIAMS, JUBRI WEST, QUIANA WELCH (and was WELCH's brother), and others.  During the conspiracy, WIMBUSH obtained large quantities of heroin from TAYLOR and other co-conspirators, and on one occasion, possessed in furtherance of the conspiracy a large quantity of suspected heroin along with a semi-automatic assault rifle, three semi-automatic pistols, and dozens of rounds of ammunition.  On or about July 6, 2012, WIMBUSH was convicted in the Superior Court of New Jersey, Mercer County, of a felony offense, namely, manufacture/distribution of a

controlled dangerous substance (or possession with intent to do so). Accordingly, federal law prohibited WIMBUSH from possessing a firearm.

r.     TAQUAN WILLIAMS participated in the drug-trafficking conspiracy and was an associate of WIMBUSH, HALL, defendant JUBRI WEST, and others.  As described herein, in furtherance of the conspiracy, WILLIAMS possessed with WIMBUSH and WEST a large quantity of heroin along with a semi-automatic assault rifle, three semi-automatic pistols, and dozens of rounds of ammunition.  On or about October 20, 2017, WILLIAMS was convicted of a felony offense in the Superior Court of New Jersey, Mercer County, namely, aggravated assault.  Accordingly, federal law prohibited WILLIAMS from possessing a firearm.

s.     JUBRI WEST participated in the drug-trafficking conspiracy and was an associate of defendants WIMBUSH, WILLIAMS, HALL, and others. As described herein, in furtherance of the conspiracy, WEST possessed with WIMBUSH and WILLIAMS a large quantity of heroin along with a semi-automatic assault rifle, three semi-automatic pistols, and dozens of rounds of ammunition.

t.     MALIK BINGHAM, a/k/a "Fresh," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, COUNCIL, AUSMORE, HALL, and others.  During the conspiracy, TAYLOR supplied BINGHAM with heroin for BINGHAM to re-distribute, for profit, to others in and around Trenton and elsewhere.  BINGHAM used a telephone facility ending in 9508 (the "BINGHAM 9508 Facility") to communicate in furtherance of the conspiracy.

u.     DEAVON WARNER, a/k/a "Tug," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, COUNCIL, AUSMORE, PHELPS, and others.  During the conspiracy, WARNER distributed, for profit, quantities of heroin and prescription pills.  WARNER used a telephone facility ending in 8604 (the "WARNER 8604 Facility") to communicate in furtherance of the conspiracy.

v.     JAQUAN WADE was a member of the drug-trafficking conspiracy and was an associate of TAYLOR and others.  During the conspiracy, TAYLOR regularly supplied WADE with packages of heroin for WADE to redistribute, for profit, to others in and around Trenton and elsewhere.  WADE used a telephone facility ending in 2928 (the "WADE 2928 Facility") to communicate in furtherance of the conspiracy.

w.     QUIANA WELCH, a/k/a "KiKi," was a member of the drug-trafficking conspiracy and was an associate of TAYLOR, WIMBUSH (and was WIMBUSH's sister), WILLIAMS, WEST, HALL, and others.  During the conspiracy, TAYLOR supplied WELCH with quantities of heroin for WELCH to

re-distribute, for profit, to others in and around Trenton and elsewhere. WELCH used a telephone facility ending in 8441 (the "WELCH 8441 Facility") to communicate in furtherance of the conspiracy.

        x.    KALEIB COX, a/k/a "Lito" participated in the drug-trafficking conspiracy and was an associate of TAYLOR, ROBERTS and others. As described herein, during the conspiracy, COX was arrested shortly after ROBERTS supplied COX with a large quantity of suspected heroin.

        y.    VARLEE KOON participated in the drug-trafficking conspiracy and was an associate of PAPI.  As described herein, during the conspiracy, KOON was arrested shortly after PAPI supplied KOON with a large quantity of suspected heroin.

        z.    LATRICE WHARTON participated in the drug-trafficking conspiracy and was an associate of TAYLOR.  On at least one occasion, WHARTON agreed to (and did) pick up a large supply of heroin from ROBERTS on behalf of TAYLOR.  WHARTON used a telephone facility ending in 5526 (the "WHARTON 5526 Facility") to communicate in furtherance of the conspiracy.

        7.    Law enforcement's investigation of the drug-trafficking conspiracy included the use of court-authorized wiretaps, numerous controlled purchases of heroin and other narcotics from multiple co-conspirators, consensually recorded telephone calls and text messages, physical and video surveillance, information provided by multiple confidential sources of information deemed credible and reliable, and other investigative techniques.  The investigation has revealed the manner and means by which members of the conspiracy carried out the organization's unlawful drug-trafficking activities.  Among other things, members of the conspiracy did the following in furtherance of the conspiracy's unlawful objectives:

        a.    obtained large quantities of heroin and other narcotics from various sources, including from PAPI and another supplier located in or around Newark, New Jersey;

        b.    distributed, for profit, large quantities of heroin and other narcotics to other co-conspirators, various dealers, sub-dealers, and end users in and around Trenton and the surrounding areas;

        c.    possessed numerous firearms and ammunition in furtherance of their drug-trafficking activities; and

        d.    took affirmative steps to avoid detection by law enforcement, including using multiple cellular telephone facilities with fictitious or no

subscriber information, using multiple vehicles to conduct their unlawful activities, and conducting counter-surveillance of law enforcement.

## II.   CONTROLLED PURCHASES

8.     Multiple confidential sources of information assisted law enforcement during this investigation, including by conducting controlled purchases of heroin, crack cocaine, and prescription pills from defendants TAYLOR, COUNCIL, and PHELPS, among others.  The information and assistance provided during the investigation by these confidential sources of information has been corroborated through other evidence obtained during the investigation, including court-authorized wiretaps, physical surveillance, and consensually recorded calls and meetings.

### A.     Controlled Purchases from COUNCIL

9.     Between in or around October 2017 and in or around June 2018, law enforcement executed more than a dozen controlled purchases of various controlled substances from COUNCIL.  The narcotics purchased from COUNCIL included suspected heroin, crack cocaine, oxycodone, Vicodin, and Xanax.  Two of these controlled purchases, which consensually were recorded by a confidential source, are described in paragraphs 10 and 11, below.

10.     In or around November 2017, a confidential source, acting at the direction of law enforcement, communicated via telephone with COUNCIL (who used the COUNCIL 7893 Facility), and COUNCIL agreed to sell the confidential source a quantity of heroin.  Law enforcement established physical surveillance at the agreed-upon location for the transaction.  After the confidential source arrived, law enforcement observed COUNCIL approach the confidential source's vehicle, hand the confidential source a package of suspected heroin, and accept the agreed-upon purchase price of the heroin from the confidential source.  COUNCIL then departed the area.  Thereafter, the confidential source provided to law enforcement the single package of heroin—referred to as a "brick"—that the confidential source purchased from COUNCIL.  The baggies comprising the brick bore an ink stamp that read "Bad Bunny," and contained a quantity of suspected heroin.[1]

---

[1]     A "brick" of heroin typically contains approximately 50 smaller, individually packaged glassine envelopes or baggies containing heroin, which are bundled together in "bundles" of approximately ten envelopes or baggies, which are then wrapped and taped to form a small package, referred to as a brick.  A brick typically contains a total of approximately one gram of heroin.  Bricks of heroin often are identified by an ink "stamp" on the individual baggies containing the heroin.  Heroin dealers and users often use these stamps to establish a brand or marketing for the source of that heroin.  Sales by different individuals of packages of heroin bearing the same stamp indicate coordination amongst those individuals and a common source of the same heroin supply.

11.    In or around December 2017, a confidential source, acting at the direction of law enforcement, communicated via telephone with COUNCIL (who used the COUNCIL 7893 Facility), and COUNCIL agreed to sell the confidential source a brick of heroin and a quantity of crack cocaine.  Law enforcement established physical surveillance at the agreed-upon location for the transaction.  When the confidential source arrived at the location, COUNCIL called the confidential source using the COUNCIL 7893 Facility and instructed the confidential source to proceed to an alternative location, which the confidential source did.  Once the confidential source arrived at the second location, the confidential source got into COUNCIL's vehicle and they executed the transaction.  Thereafter, the confidential source provided to law enforcement the brick of heroin that the confidential source purchased from COUNCIL, which contained baggies bearing various ink stamps, namely, "Buddah," "Frank Lucas," and "ASAP," and contained a quantity of suspected heroin.  The confidential source also provided to law enforcement the quantity of suspected crack cocaine that the confidential source purchased from COUNCIL.

**B.    Controlled Purchases of Heroin From TAYLOR**

12.    Between in or around June 2018 and in or around September 2018, law enforcement executed more than a dozen controlled purchases of suspected heroin from TAYLOR.  Two of these controlled purchases, which consensually were recorded by a confidential source, are described in paragraphs 13 and 14, below.

13.    In or around July 2018, a confidential source, acting at the direction of law enforcement, communicated via telephone with TAYLOR (who used the TAYLOR 6655 Facility), and TAYLOR agreed to sell the confidential source a quantity of heroin.  Law enforcement established surveillance at the agreed-upon location for the transaction, and observed TAYLOR walk up to the confidential source's vehicle.  TAYLOR handed the confidential source through the window the agreed upon quantity of heroin, and the confidential source handed TAYLOR the agreed-upon amount of money.  TAYLOR then walked away and the confidential source left the area in his/her vehicle.  Thereafter, the confidential source provided to law enforcement the packages that the confidential source purchased from TAYLOR, which bore an ink stamp that read "Black Panther," and contained a quantity of suspected heroin.

14.    In or around August 2018, a confidential source, acting at the direction of law enforcement, communicated via telephone with TAYLOR (who used the TAYLOR 6655 Facility), and TAYLOR agreed to sell the confidential source a quantity of heroin.   Law enforcement established surveillance at the agreed-upon location for the transaction, and observed TAYLOR walk up to the confidential source's vehicle.  TAYLOR handed the

confidential source through the window the agreed upon quantity of heroin, and the confidential source handed TAYLOR the agreed-upon amount of money.  TAYLOR then walked away and the confidential source left the area in his/her vehicle.  Thereafter, the confidential source provided to law enforcement the bricks that the confidential source purchased from TAYLOR, which bore an ink stamp that read "Iron Man 2," and contained a quantity of suspected heroin.

### C.    Controlled Purchases From PHELPS

15.    During the investigation, law enforcement executed at least two controlled purchases of suspected heroin and crack cocaine from PHELPS. These transactions, which were consensually recorded by a confidential source, are described below in paragraphs 16 and 17, below.

16.    In or around January 2018, a confidential source, acting at the direction of law enforcement, communicated with PHELPS via telephone, and PHELPS agreed to sell the confidential source a quantity of heroin.   Law enforcement established surveillance at the agreed-upon location for the transaction, and observed PHELPS arrive in a vehicle at the agreed-upon time. PHELPS got out of his car and got in the front passenger seat of the confidential source's vehicle.  Thereafter, PHELPS and the confidential source exchanged an agreed-upon amount of cash for an agreed-upon amount of heroin.  PHELPS then got out of the confidential source's vehicle and got back into his vehicle, and left the area.  Thereafter, the confidential source provided to law enforcement the packages that the confidential source purchased from PHELPS, which contained a quantity of suspected heroin.

17.    .On another date in or about January 2018, a confidential source, acting at the direction of law enforcement, communicated with PHELPS via telephone, and PHELPS agreed to sell the confidential source quantities of heroin and crack cocaine.  Law enforcement established surveillance at the agreed-upon location for the transaction, and observed PHELPS arrive in a vehicle at the agreed-upon time.  PHELPS got out of the front passenger's seat and got in the front passenger seat of the confidential source's vehicle and directed the confidential source to drive to another location.  When they arrived at that location, PHELPS got out of the vehicle, and returned a short time later, whereupon PHELPS got back in the car.  PHELPS and the confidential source exchanged an agreed-upon amount of cash for an agreed-upon amount of heroin.  During the transaction, PHELPS told the confidential source to call him (PHELPS) "B."  PHELPS then got out of the confidential source's vehicle and the confidential source left the area.  Thereafter, the confidential source provided to law enforcement the packages that the confidential source purchased from PHELPS, which contained quantities of suspected heroin and crack cocaine.

## II.   WIRETAPS

18.   From in or around August 2018 to in or around October 2018, law enforcement, acting pursuant to wiretap orders entered by the United States District Court for the District of New Jersey, intercepted wire and electronic communications over the following cellular telephone facilities, which TAYLOR, COUNCIL, and AUSMORE used in furtherance of the conspiracy:

a.   From in or around August 2018 to in or around October 2018, law enforcement intercepted telephone calls and text messages over the TAYLOR 6655 Facility, which TAYLOR used to communicate with his co-conspirators and others in furtherance of the conspiracy.

b.   In or around August 2018, law enforcement intercepted telephone calls over the TAYLOR 7717 Facility, which TAYLOR used to communicate with his co-conspirators and others in furtherance of the conspiracy.

c.   From in or around August 2018 to in or around October 2018, law enforcement intercepted telephone calls and text messages over the COUNCIL 7893 Facility, which COUNCIL used to communicate with his co-conspirators and others in furtherance of the conspiracy.

d.   In or around October 2018, law enforcement intercepted telephone calls and text messages over the AUSMORE 1394 Facility, which AUSMORE used to communicate with his co-conspirators and others in furtherance of the conspiracy.

19.   The telephone calls and text messages intercepted over these telephone facilities further revealed the scope and details of the conspiracy's unlawful drug-trafficking activities, including the identities of several of its narcotics suppliers and other co-conspirators.  Summarized below are some of the communications that law enforcement intercepted by, between, and amongst the co-conspirators and others in furtherance of the conspiracy.[2]

---

[2]   Unless noted otherwise, all communications described in this complaint involving COUNCIL occurred over the COUNCIL 7893 Facility, and all communications involving TAYLOR occurred over the TAYLOR 6655 Facility.

**TAYLOR, ROBERTS, and PAPI**

20.     During the investigation, law enforcement intercepted numerous communications over the TAYLOR 6655 Facility between and amongst TAYLOR, ROBERTS, and PAPI that were in furtherance of the drug-trafficking conspiracy.  These communications revealed, among other things, that PAPI supplied significant quantities of heroin to ROBERTS and TAYLOR on a regular basis, and that ROBERTS and TAYLOR re-distributed those supplies of heroin to others in and around Trenton and elsewhere.  During and in furtherance of the conspiracy, PAPI agreed to supply TAYLOR and ROBERTS with well more than one kilogram of heroin.

21.     The communications intercepted over the TAYLOR 6655 Facility also revealed that, in furtherance of the conspiracy, TAYLOR agreed to supply, and did supply, other co-conspirators, various dealers, sub-dealers, and end users with the supplies of heroin that he obtained.  The individuals to whom TAYLOR supplied heroin include, but are not limited to, co-conspirators COUNCIL, WIMBUSH, VICEY, ANDERSON, HALL, HAMPTON, CHESTON, ELLIS, WARNER, WADE, WELCH, and others.

22.     Summarized in paragraphs 23 through 38 below are communications intercepted over the TAYLOR 6655 Facility demonstrating some of TAYLOR, ROBERTS, and PAPI's acts in furtherance of the conspiracy.  Additional communications intercepted over the TAYLOR 6655 Facility demonstrating other co-conspirators' roles in the conspiracy are summarized elsewhere in this complaint.

23.     On or about August 7, 2018, TAYLOR received an incoming call from an unidentified male, who asked whether TAYLOR had "any other names"—referring to the ink stamps on the bricks of heroin that TAYLOR had supplied.  The male stated that "my people trying to bring that Hellfire shit back, they don't want that"—referring to particular bricks bearing an ink stamp that read "Hellfire."  TAYLOR responded, "I only got Frank Lucas"—referring to a different stamp, and TAYLOR advised the male to return the "Hellfire" packages.  Shortly thereafter, TAYLOR called the ROBERTS 8686 Facility and spoke with ROBERTS.  TAYLOR asked, "You don't got any other names besides the Hellfire?"  ROBERTS said that he would call TAYLOR right back.  Thereafter, TAYLOR again called the ROBERTS 8686 Facility and spoke with ROBERTS, who informed TAYLOR that he was trying to swap out the "Hellfire."

24.     On or about August 8, 2018, TAYLOR and ROBERTS had multiple telephone conversations, during which they discussed when "Pop"—i.e., PAPI— would be ready to provide additional supplies of heroin.  TAYLOR and ROBERTS also discussed how much money TAYLOR owed to ROBERTS for

heroin supplies that ROBERTS had obtained from PAPI and provided to TAYLOR.

25.     On or about August 9, 2018, TAYLOR had multiple telephone conversations with both ROBERTS and PAPI regarding when a new supply of heroin would be ready.  Among other things, PAPI—who used the PAPI 2384 Facility—told TAYLOR that he was "a little backed up" due to multiple customer orders.  However, PAPI said, "right now I'm like about a hundred, but I'm gonna try to get at least four or five together"—meaning that PAPI had approximately 100 bricks of heroin ready at that time, but was trying to prepare 400 or 500 bricks to distribute.  In addition, PAPI told TAYLOR that he had given ROBERTS a "little sample" of the heroin "so he could make sure he could double check" that the supply was high quality.  TAYLOR and ROBERTS separately discussed when the supply from PAPI would be ready, and also agreed that TAYLOR would give ROBERTS additional money for the supply. In a later call, ROBERTS confirmed to TAYLOR that PAPI had given ROBERTS a sample of heroin, and that ROBERTS had distributed those samples to individuals on Perry Street in Trenton.

26.     On or about August 10, 2018, TAYLOR had numerous telephone conversations with PAPI (who used the PAPI 2384 Facility), ROBERTS (who used the ROBERTS 8686 Facility), and others regarding a large supply of heroin.  The intercepted communications revealed that that PAPI supplied heroin to ROBERTS, who in turn supplied TAYLOR with approximately 100 bricks of heroin bearing ink stamps that read "Obsession" and "Scarface." Indeed, law enforcement conducted physical surveillance and observed ROBERTS and TAYLOR meet in person to conduct the transaction.[3] During the series of communications intercepted on or about August 10, 2018, PAPI also told TAYLOR that he would have another 200 bricks of heroin ready the following day.

27.     The next day, on or about August 11, 2018, TAYLOR again had multiple communications with PAPI, ROBERTS, and others regarding the heroin that had been supplied the day before, as well as additional heroin that PAPI would supply in the future.  For example, in one telephone call between TAYLOR and HALL, TAYLOR stated that "My Papi (i.e., PAPI) 'bout to give me another hundred today, I got a hundred yesterday.  Yeah, I'm trying to move these shits and then spend some money with your peoples and see if he gonna front me some more shit.  I got some shit called 'Obsession' right now."

28.     In another call between TAYLOR and PAPI on or about August 11, 2018, PAPI informed TAYLOR that everything was "looking good," and that

---

[3]     Shortly after observing ROBERTS supply TAYLOR with heroin, officers separately observed ROBERTS provide an additional supply of heroin to co-conspirator COX.  That transaction is described in paragraphs 188 through 192, below.

PAPI would be ready in a few hours with "further than two, closer to three"—meaning more than 200 bricks but closer to 300 bricks. PAPI then advised TAYLOR, in sum and substance, that PAPI would attempt to prepare for TAYLOR at least 200 or 300 bricks of heroin every day. During the same conversation, PAPI asked TAYLOR, "What you all needing, like exact, like what, like a thousand?"—meaning 1,000 bricks of heroin. TAYLOR responded, "Yeah." The same day, TAYLOR and ROBERTS had a telephone conversation during which they agreed, in sum and substance, that the heroin PAPI had supplied was high quality and popular with customers.

29.     The next day, on or about August 12, 2018, TAYLOR called the PAPI 2384 Facility and spoke with PAPI. During the call, TAYLOR asked PAPI about the particular stamps that PAPI had supplied: "What was the new names you gave me, besides Obsession?" PAPI answered, "It was, um, Scarface and Football or Super Bowl." TAYLOR then said, "Right, right, that Obsession, that shit fire though, you heard"—meaning high quality. TAYLOR continued, stating that "as long as the other shit like that too it's gonna be a smooth ride. You gave bro [i.e., ROBERTS] like three, right?"—meaning 300 bricks. PAPI answered, "Yeah."

30.     On or about August 14, 2018, TAYLOR called PAPI and discussed upcoming supplies of heroin. Among other things, TAYLOR again stated that he was "trying to bring the count up to one thousand"—meaning 1,000 bricks of heroin. PAPI agreed, and responded, in sum and substance, that he was trying to have 1,400 or 1,500 bricks of heroin to supply, and said that it would be "better for me like that. One shot, boom." In other words, TAYLOR and PAPI discussed the preferability of larger deliveries of heroin—of at least 1,000 bricks of heroin and possibly as high as 1,500 bricks—rather than smaller deliveries of 100 or 200 bricks that had to be made more frequently. TAYLOR bragged, "I'll be able to flood the streets." TAYLOR also told PAPI that "[t]he recipe you have is good, that's shit's good." PAPI responded, "I'm gonna try to make it even better than that." Two days later, on or about August 16, 2018, TAYLOR called the ROBERTS 8686 Facility and spoke with ROBERTS. Among other things, TAYLOR told ROBERTS that PAPI was trying to put "the big load together."

31.     During the conspiracy, TAYLOR also asked PAPI to help him obtain firearms for protection. Specifically, on or about August 15, 2018, TAYLOR received a call from the PAPI 2384 Facility and spoke with PAPI. During the conversation, TAYLOR and PAPI discussed how long it would take to put together the large supply of heroin that they had previously discussed. TAYLOR asked, "How long you think a thousand or 1400 gonna take you?" PAPI responded, "To be honest, 1400, like five—five, six days," and TAYLOR said, "Alright." TAYLOR then asked, in sum and substance, if PAPI could obtain firearms for TAYLOR, which TAYLOR referred to as "situations." PAPI asked, "Oh yeah, the, the other shit?" TAYLOR said, "No, some protection."

PAPI said, "Oh, protection," and then said, "Yeah, I gotta, I gotta talk to my boy. I got somebody for that. I gotta call him up." TAYLOR explained, "Man, bitch need that cause, you know, this shit's, it's getting real now, you know, a lot of hate coming up and shit." PAPI said that he would talk to his firearm contact and would let TAYLOR know. TAYLOR said, "Alright, try to see what you can round up for us, man. Cause this shit's actually getting heavy out here, you know?"

32.    On or about August 17, 2018, TAYLOR had multiple communications with both ROBERTS and PAPI, during which they discussed the quality of the existing supplies of heroin, and the status of the next heroin supply. During these communications, PAPI began asking TAYLOR and ROBERTS for large amounts of money that PAPI said he needed to pay his own suppliers. For example, PAPI (using the PAPI 2384 Facility) sent the following text messages to TAYLOR:

| Sender | Recipient | Message |
|--------|-----------|---------|
| PAPI | TAYLOR | Yoo i was talking to my peoples. And they told me that i have to give them atleast 12 [i.e., $12,000] for tomorry cuz i told them to hold me up till tomorrow. Cuz this i[s] |
| PAPI | TAYLOR | [i]s too little what i have. I want to see them with that so they can let me get the other stuf the dont want to give me that untill i see them with that p[lease] |
| PAPI | TAYLOR | [p]lease try to make it up for tomorrow so we can be good with more |

33.    On or about August 18, 2018, TAYLOR received a call from the ROBERTS 8686 Facility and spoke with ROBERTS. ROBERTS said that he had been speaking with PAPI, and that PAPI was "gonna bring something down," but that PAPI needed $8,000 because PAPI's "people don't want to give him what he want . . . cuz he always in the hole." TAYLOR and ROBERTS further discussed helping PAPI to repay a debt owed to PAPI's suppliers, so that PAPI then "can start getting the motherlode"—meaning a very large delivery of heroin that PAPI, TAYLOR, and ROBERTS previously had discussed.

34.    On or about August 18, 2018, based on, among other things, the conversations described in paragraphs 32 and 33, above, and other communications intercepted over the TAYLOR 6655 Facility, law enforcement

officers established physical surveillance of TAYLOR, ROBERTS, and PAPI in or around Trenton, and in other locations outside of Trenton.  Among other things, officers observed TAYLOR and ROBERTS meet in Trenton.  Thereafter, officers observed ROBERTS meet PAPI at another location in Trenton, and observed PAPI get in ROBERTS's vehicle.  While PAPI was still in the vehicle, ROBERTS called TAYLOR and said that he was with PAPI, and that PAPI "got 130 right now, but he said he gonna try to make 400, gonna go up tonight, and bring them back tomorrow."  Subsequent communications intercepted over the TAYLOR 6655 Facility, in conjunction with law enforcement's physical surveillance, revealed that another individual, acting on TAYLOR's behalf, agreed to and did meet ROBERTS to pick up the supply of heroin.

35.    On or about August 23, 2018, TAYLOR called the ROBERTS 2557 Facility and spoke with ROBERTS.  TAYLOR said that he had just spoken to PAPI, and that PAPI wanted "five, six"—meaning $5,000 or $6,000.  ROBERTS said, "I'm saying, [we] should pacify him with something."  TAYLOR said, "Yeah, give him something, bitch, I'm telling you, bitch, that's shit's gotta be fire, bitch stalling, bitch, that shit's gotta be good, man.  N***as talking about the bitch got garbage now."  In other words, TAYLOR and ROBERTS discussed giving PAPI some money to satisfy him, but that PAPI needed to give them high quality heroin in the next supply.  Later that day, TAYLOR called the ROBERTS 2557 Facility and spoke with ROBERTS.  During the conversation, TAYLOR advised ROBERTS that "He [PAPI] said tomorrow he going to have like 200"— meaning 200 bricks of heroin—and that "it's going to be a different name," meaning a new ink stamp.

36.    On or about September 10, 2018, TAYLOR received a call from a telephone number ending in 3311 and spoke for approximately 24 minutes with an unidentified male.  During the conversation, TAYLOR and the male discussed, among other things, TAYLOR's recent successes in drug trafficking.  The male congratulated TAYLOR, telling him that "You the talk of the town."  TAYLOR bragged that he had acquired "eleven hundred packs," and that he was "trying to get that pushed to two thousand."  TAYLOR also stated that once he had sold the entire 1,100 bricks, he would be "touching one hundred thousand"—meaning that he would have made $100,000 selling heroin obtained from PAPI.  Moreover, TAYLOR stated, "I did all of this in two months."

37.    On or about September 27, 2018, TAYLOR received an incoming call from a male detained at the Mercer County Correctional Center.  During the conversation, TAYLOR and the male discussed firearms.  TAYLOR told the male that he had "a 50 round drum for a .40, two .40's, a .38, and a tech"— referring to firearms of varying caliber, and an extended magazine capable of loading fifty rounds of ammunition.  Consistent with that comment, during the conspiracy, TAYLOR transmitted the following image from the TAYLOR 6655 Facility to another individual, along with a message that read, "War ready":



38.    On or about October 7, 2018, TAYLOR received a call from a male who, at that time, was living in a halfway house.  TAYLOR and the male discussed, in sum and substance and among other things, TAYLOR's recent successes in distributing heroin.  The male asked TAYLOR, "What's good with you?", and TAYLOR said that he was "running this shit up."  The male responded, "I already know, already hearing good things.  I said, Jak back, Jak back out there on his shit, you heard?"  TAYLOR bragged, "Yeah, bitch, I got the town right now, bitch."

### COUNCIL

39.    The investigation revealed that, in furtherance of the drug-trafficking conspiracy, COUNCIL distributed narcotics on a daily basis to others, for profit, in and around Trenton.  Through the controlled purchases of controlled substances described above and communications intercepted pursuant to the court-authorized wiretap orders, the investigation revealed that, during the conspiracy, COUNCIL agreed to distribute—and regularly did distribute—heroin, powder cocaine, crack cocaine, oxycodone, Percocet, Dilaudid (hydromorphone), morphine, Suboxone, Xanax, and other controlled substances to others in and around Trenton and elsewhere.

40.    During and in furtherance of the conspiracy, COUNCIL communicated with TAYLOR, AUSMORE, PHELPS, LEARY, BINGHAM, ROBERTS, BRANDON COUNCIL and others regarding the conspiracy's unlawful distribution of narcotics.  Some of COUNCIL's communications revealing his unlawful narcotics trafficking and his participation in the conspiracy are summarized in paragraphs 41 through 49, below.

41.     On or about August 12, 2018, TAYLOR called the AUSMORE 1394 FACILITY and spoke with AUSMORE.   TAYLOR asked AUSMORE to tell "Y-O"—*i.e.*, COUNCIL—to "call my phone." Shortly thereafter, COUNCIL received an incoming call from the AUSMORE 1394 FACILITY and spoke with AUSMORE.  As TAYLOR had requested, during the conversation, AUSMORE told COUNCIL to call "Jak," *i.e.*, TAYLOR.  Shortly thereafter, COUNCIL did so. COUNCIL called TAYLOR and spoke briefly with TAYLOR.  During the call, COUNCIL and TAYLOR agreed to meet in person at a plaza located in or around Trenton.

42.     The next day, on or about August 13, 2018, COUNCIL sent two text messages to TAYLOR.  The first text message read, "It's ok one girl liked it but one girl complained regular shit, what's good tho."  The second text message read, "I'm at school I'm hit you when it gets low."  In other words, when COUNCIL and TAYLOR met the day before in the plaza, TAYLOR supplied COUNCIL with a quantity of heroin.  Through the text messages, COUNCIL informed TAYLOR about the reviews that his (COUNCIL's) heroin customers gave with respect to that particular supply, and COUNCIL advised TAYLOR that he would let TAYLOR know when he needed additional supplies of heroin.

43.     On or about August 24, 2018, COUNCIL received an incoming call from an unidentified male and discussed with the male the availability of heroin.  COUNCIL stated, in sum and substance, that he had a drug customer that wanted heroin packages bearing "Iceberg" or "Joker's Wild" stamps. The male said that he might have those stamps, but that he also had packages bearing a "Mars 24" stamp."

44.     On or about August 31, 2018, COUNCIL received an incoming call from one of his female heroin customers.  During the conversation, COUNCIL and the female discussed various packages then being distributed.  COUNCIL asked the female about heroin packages she was obtaining, and the female answered, "Audi," and said it was a purple stamp.  The female also said, "Before it was 'Audi,' it was 'Frank Lucas' and 'AK-47,' but, um, the other stuff that was 'Carrie' and then it was 'Joe' and all the same dope but it was a different name."  COUNCIL asked the female if she "had the shit called 'Cream'?", and the female said that Cream was good, but the bags were "really small."  COUNCIL then said that "the new batch came around," and that he was "about to get that and it's gonna be real good."

45.     On or about September 12, 2018, COUNCIL received an incoming call from the AUSMORE 1394 Facility and spoke with AUSMORE.  AUSMORE informed COUNCIL that CHESTON had been arrested with one or more firearms at the Trenton Train Station, an incident described in paragraphs 162 through 171, below.  During the conversation, AUSMORE indicated that rumors had begun to spread that "Jak-o"—*i.e.*, TAYLOR—had set CHESTON

up.  Referring to TAYLOR, COUNCIL asked, "Oh yeah, which one, ours?"
AUSMORE confirmed that he was speaking about "Jak," *i.e.*, TAYLOR.

46.    On or about September 21, 2018, COUNCIL sent a text message to
TAYLOR that read, "Call Fresh [*i.e.*, BINGHAM] 743-9508."    Two minutes
later, TAYLOR responded with a text message that read, "What happen."
COUNCIL responded, "he wanted ya number."  Shortly thereafter, BINGHAM
called TAYLOR and told TAYLOR that "I had needed some, I needed like five
[bricks of heroin], but I had got it now, but I'm about to store you in, I'm gonna
hit you."  TAYLOR said, "Alright."

47.    On or about September 24, 2018, TAYLOR called and spoke with
COUNCIL.  At the outset of the conversation, COUNCIL warned TAYLOR, "Bitch
you seen that blue truck that was behind you earlier?", referring to law
enforcement.  TAYLOR said, "Yeah, that wasn't them, though."  TAYLOR also
asked COUNCIL if COUNCIL had some "Percs," referring to Percocet pills.
COUNCIL said, "I had some 15s, them shits gone."  COUNCIL then asked,
"What's up with you, nef, the sitch-y-ation [situation], you got your hands on
something?"—referring to supplies of heroin.  TAYLOR answered, "Like a hour,"
and COUNCIL said, "I'm probably gonna be at school, I'll probably call you after
school then."

48.    Later during the conversation, TAYLOR also asked COUNCIL for
COUNCIL's advice about one of TAYLOR's "traps," meaning a drug customer.
Specifically, TAYLOR said that "My trap just hit me, right."  TAYLOR then
summarized for COUNCIL his history with the customer:  "He used to be
grabbing the 2, I had him at 170 for 2"—meaning that TAYLOR originally
charged the customer $170 per brick, if the customer bought two bricks of
heroin at a time.  TAYLOR then said, "Then I took him up to 5 for 145"—
meaning that TAYLOR decreased the price to $145 per brick, if the customer
purchased five bricks at a time.  TAYLOR continued: "Then I took him to
10 for 135.  Now he talking about can I buy 20 [bricks] for 2K."  COUNCIL said,
"Hmmm.  Bitch, you know him?"  TAYLOR answered,  "Yeah.  I been, I been
frontin' him, like he buy 10, I front him 10.  Like he be, he be talking about he
got the money that he owe me.  But he be trying to buy 20, can I front him 20."
TAYLOR continued, "But the front, the front, the front always be 150 a pack."
COUNCIL responded with caution, advising TAYLOR , "But still, you ain't
gotta—Listen, you give a n***a what they can handle.  You ain't gotta give em
bitch, I mean, you know.  You, you gotta understand with that shit right there,
the risk, the risk is, is higher than the reward, you feel me?  You know what I
mean, shit like that.  If a n***a, let's say if a n***a ran off or fucked some shit
up, you feel me?  You takin' way bigger loss, you feel me?  That's how I look at
it.  You know what I mean?  You keep dealin' with a bitch with what they can
handle."  COUNCIL further explained, "That's how I look at it, but everybody,
everybody moves different."

49.    On or about September 29, 2018, COUNCIL called and spoke with TAYLOR.  During the conversation, COUNCIL asked TAYLOR, in sum and substance, where TAYLOR was, because he (COUNCIL) "need[ed] a couple," meaning bricks of heroin, and TAYLOR agreed to sell the heroin to COUNCIL. Shortly thereafter, COUNCIL sent a text message to TAYLOR that read, "Here." Approximately five minutes later, COUNCIL made an outgoing call from the COUNCIL 7893 Facility to a telephone number ending in 0471 and spoke to an unidentified male.  During the conversation, COUNCIL told the male that he had "Empire Red," and the male said that he would call COUNCIL back later. About three hours later, the male called COUNCIL back, and asked, "What stamp you got?"  COUNCIL answered, "Empire, Empire red."  COUNCIL and the male then agreed to conduct the transaction the following day.  The investigation revealed that at and around this time, TAYLOR was distributing— and was discussing the availability of—heroin packages bearing a red ink stamp that read, "Empire."

***PHELPS***

50.    The investigation revealed that PHELPS was a principal member of the drug-trafficking conspiracy, and that he distributed heroin and crack cocaine, among other controlled substances, in furtherance of the conspiracy.

51.    On or about January 26, 2018, PHELPS was arrested by local law enforcement at 1228 Ohio Avenue in or around Trenton on an outstanding warrant.  Based on contraband found in the residence, law enforcement obtained a warrant to search the premises, and located a firearm in PHELPS's jacket.  PHELPS subsequently confessed to law enforcement that the firearm belonged to him, and he was charged with local firearms offenses.  On or about April 19, 2018, PHELPS was charged in federal court with possession of a firearm after having been convicted of a felony offense.  PHELPS has been detained (first in local custody, subsequently in federal custody) since his arrest.

52.    Following his arrest, on or about February 4, 2018, PHELPS had multiple telephone conversations from within the Mercer County Correctional Center with, among others, COUNCIL, AUSMORE, LEARY, ANDERSON, and PHELPS's mother.  During these conversations, PHELPS discussed, in sum and substance and among other things, the circumstances of his arrest, and how law enforcement knew PHELPS would be in the house at 1228 Ohio Avenue at that particular time on or about January 26, 2018.  These conversations also shed additional light on PHELPS's membership in the conspiracy and his narcotics trafficking in furtherance of it.  For example:

a.      During one conversation with COUNCIL, PHELPS claimed not to have engaged in narcotics trafficking out of 1228 Ohio Avenue, although PHELPS did acknowledge that he "had two bags of motherfucking haze" at the house—referring to narcotics—and officers "didn't even find that."

b.      During a conversation with AUSMORE, PHELPS directed AUSMORE to contact another individual and have that individual erase everything "completely," including photographs from PHELPS's Facebook profile.  AUSMORE also asked why PHELPS would not "give the phone to somebody else"—meaning provide contacts for PHELPS's narcotics customers—to another co-conspirator.  PHELPS answered, "Stinking breaths got it"—meaning that law enforcement had seized the telephone with PHELPS's drug customers.  PHELPS, however, claimed, in sum and substance, that nothing was on the phone.

c.      During a conversation with LEARY, PHELPS discussed the "situation" on Sanford, and advised LEARY to "go ahead and shut the situation down, too, Buck, because they [law enforcement] was asking about the situation around there."  PHELPS further advised that LEARY and other co-conspirators "got to be easy out there cuz it's deeper.  They want us locked up."

d.      During a conversation with PHELPS's mother, PHELPS's mother told PHELPS that law enforcement wanted him, "they don't want nobody else, because you the leader.  They think you the leader out there."  PHELPS claimed not to be a leader, but then also told his mother, in sum and substance, that other individuals wanted "the house down there," and that "they gonna send them down there [to] where I'm at, you know?"—meaning that other individuals would seek to take over the location from which PHELPS and his co-conspirators distributed narcotics.  PHELPS's mother asked, "Who wanted the house?"—referring to the house at 1228 Ohio Avenue, where PHELPS had been arrested.  PHELPS corrected her, stating, "Yeah, I ain't talking about the house down there, I'm talking about the house on Sanford Street"—i.e., the location from which PHELPS principally stored and sold narcotics.  In response, PHELPS's mother said that PHELPS ought to warn a particular family member "to stay from over there"—meaning avoid Sanford.

53.      In addition to the controlled purchases of narcotics from PHELPS and the recorded jail calls described herein, intercepted communications over the COUNCIL 7893 Facility also revealed PHELPS's participation in the conspiracy and his relationship with multiple co-conspirators.  For example, on or about August 25, 2018, COUNCIL received an incoming call from the LEARY 8155 Facility and spoke with LEARY.  During the conversation, LEARY asked COUNCIL to provide him some "bars," referring to prescription pills.  Thereafter, LEARY said to COUNCIL, "Listen, man, if B-Money [i.e., PHELPS] go, you gotta step up, MVP."  In other words, LEARY told COUNCIL that if PHELPS—the "MVP"—were to be incarcerated for an extended period of time,

COUNCIL would need to step into the role that PHELPS no longer could play in the conspiracy. COUNCIL responded, "You know, I got it, bitch, I got a couple traps, bitch, I got, I be having n***as for miles"—meaning that COUNCIL had the wherewithal to step into the "MVP" role. LEARY continued, telling COUNCIL, "My man, listen, B-Money [PHELPS] go, you the oldest, man you gotta step up, MVP. If you ain't do it, just move out the way, let me get the reigns. Let me be MVP man, let me step up for the team. B-Money go, you in charge."

### *AUSMORE*

54.     The investigation revealed that AUSMORE was a principal member of the drug-trafficking conspiracy, and that he distributed heroin, powder cocaine, crack cocaine, and prescription pills during and in furtherance of the conspiracy. Some of the communications intercepted during the investigation revealing AUSMORE's role in the conspiracy are described in paragraphs 55 through 63, below.

55.     On or about August 13, 2018, TAYLOR obtained approximately 100 bricks of heroin from ROBERTS, which PAPI had supplied. As described in paragraphs 196 through 202, below, co-conspirator WHARTON agreed to (and did) pick up the heroin supply from ROBERTS and provide it to TAYLOR. During the course of the communications between ROBERTS and TAYLOR and TAYLOR and WHARTON coordinating the delivery, TAYLOR and AUSMORE also had a number of conversations, during which AUSMORE (using the AUSMORE 0699 Facility) warned TAYLOR about law enforcement conducting surveillance of TAYLOR. AUSMORE also relayed his observations about the surveillance of TAYLOR to COUNCIL. For example:

a.     In one telephone call, AUSMORE told TAYLOR, "Yo bitch, you know them police following you, right, they all on you, you heard?" AUSMORE then described a gold car and a silver car following TAYLOR, and identified a particular law enforcement officer whom AUSMORE knew drove one of the vehicles. AUSMORE said, "They all on you, I'm talking 'bout they racin' up there, nef."

b.     Approximately ten minutes later, AUSMORE and TAYLOR had another telephone conversation, during which AUSMORE warned of another black vehicle that he believed was law enforcement conducting surveillance on TAYLOR. AUSMORE advised TAYLOR, "Bitch, you got to put that car up"—meaning that TAYLOR needed to stop using the vehicle in which he was then using to conduct narcotics activities.

c.     Approximately forty minutes thereafter, AUSMORE and TAYLOR had another telephone conversation, during which they again discussed law enforcement's surveillance. AUSMORE recounted, in sum and

substance, how he had observed multiple officers conducting surveillance of TAYLOR. TAYLOR expressed concern about the surveillance, and AUSMORE said, "You got everybody, yo, that's all a bitch be talkin' about is you, you heard me?" TAYLOR suggested that he was "about to chill for a month, two months"—meaning decrease his drug-dealing activity out of a concern for law enforcement. AUSMORE warned TAYLOR to "park that bitch and don't drive it no more."

        d.     Later that evening, COUNCIL called the AUSMORE 1394 Facility and spoke with AUSMORE. During the conversation, AUSMORE recounted for COUNCIL, in sum and substance, that law enforcement had been "following Jak around earlier" in "unmarked cars." COUNCIL responded, "Yeah, bitch, he better not call me." During the same conversation, COUNCIL also told AUSMORE that law enforcement recently had "knocked off Lito" with "fifty bricks"—referring to COX's arrest on or about August 10, 2018, as described in paragraphs 188 through 192, below.

56.     On or about August 24, 2018, COUNCIL called the Ausmore 0699 Facility and spoke with AUSMORE. During the conversation, COUNCIL asked AUSMORE, in sum and substance, to try to find someone who had available for sale heroin packages bearing ink stamps that read, "Iceberg," "Jokers Wild," and "Red Bull." COUNCIL said that his customer told him that "the shit [is] fire," meaning high quality. AUSMORE said he did not know who had those packages, but that he would "ask around."

57.     On or about August 27, 2018, COUNCIL received an incoming call from an unidentified male seeking to obtain narcotics to re-distribute. The male said that his customer was there already waiting, and COUNCIL said that he would need at least fifteen minutes to obtain the narcotics to sell to the individual. COUNCIL then suggested that the individual call AUSMORE. The individual said that he did not know AUSMORE's number because AUSMORE "switch up number[s] so much." COUNCIL then provided the individual with the number to the AUSMORE 0699 Facility, and the individual said he was going to call AUSMORE.

58.     On or about August 28, 2018, COUNCIL called the AUSMORE 0699 Facility and spoke with AUSMORE. During the conversation, COUNCIL and AUSMORE discussed the availability and pricing of particular prescription pills that another supplier was selling. During the conversation, AUSMORE and COUNCIL also discussed, in sum and substance, the availability of heroin. COUNCIL said that he thought about contacting "Jak," but then said, in reference to TAYLOR, that "I don't really wanna call him for no couple, he probably feel like, bitch, he won't even bust that"—meaning that TAYLOR would not want to supply COUNCIL with a small number of bricks at that time.

59.     On or about August 31, 2018, COUNCIL called the Ausmore 0699 Facility and spoke with AUSMORE.  During the conversation, AUSMORE asked COUNCIL, in sum and substance, if COUNCIL had cocaine.  COUNCIL said that he did not, but was "bout to try to make something happen."  AUSMORE interrupted, and told COUNCIL that "my peoples got some."  AUSMORE also said that the supply was "good shit."  AUSMORE told COUNCIL the price for the cocaine, and COUNCIL said "let me call my peoples right quick"—referring to COUNCIL's cocaine customers.  COUNCIL then asked AUSMORE to obtain the supply for him:  "Come on, bitch, bust me down, let me see you right quick. I'm gonna get on BH [*i.e.*, BRANDON COUNCIL]," and AUSMORE said "Bitch it's fire," meaning high quality.  Immediately thereafter, COUNCIL called BRANDON COUNCIL regarding the cocaine connection that AUSMORE had obtained.

60.     On or about September 17, 2018, TAYLOR received an incoming call from the AUSMORE 1394 Facility and spoke with AUSMORE.  Among other things, AUSMORE and TAYLOR discussed text messages that AUSMORE had exchanged with another individual.  In sum and substance, AUSMORE conveyed his belief that the other individual was cooperating with law enforcement.  AUSMORE and TAYLOR discussed how the individual had asked AUSMORE to "take the wheel," meaning take over the individual's heroin distribution.  TAYLOR suggested that the individual was "trying to line a bitch up, all them packs."  AUSMORE responded, "That would have been an easy couple of joints, that's what I was thinking about"—meaning that AUSMORE could have made easy money by dealing heroin with the individual, but AUSMORE ultimately concluded that it was not worth the risk.  AUSMORE also complained that "next thing you know, little sales gonna start calling me. I'm telling you, that's how my shit was, one of my sales got knocked off." During the same conversation, AUSMORE and TAYLOR also discussed another co-conspirator not named as a defendant herein.  AUSMORE asked about that individual, and TAYLOR answered, "I don't know, I had him holding them shits"—meaning bricks of heroin—and "I took them shits back, I cut him off."

61.     On or about October 6, 2018, AUSMORE made an outgoing call to an unidentified male.  During the conversation, AUSMORE told the male that he (AUSMORE) had "some samples of some shit, that's shit's fire."  The male then asked, "What, D?", referring to heroin.  AUSMORE answered, "Yeah." Thereafter, AUSMORE stated, "Yeah, bitch, I got a bun [bundle] or two so you could, um, so you could give your people. . . . They gonna love this shit though.  When you start movin' around I'm a have it for you."  And the male said, "Alright."

62.    Later that day, AUSMORE exchanged the following text messages with ANDERSON (using the ANDERSON 8109 Facility):

| Sender | Recipient | Message |
|--------|-----------|---------|
| AUSMORE | ANDERSON | Wat the names of that shit |
| ANDERSON | AUSMORE | Death-row red stamp lil bro |
| AUSMORE | ANDERSON | Ok I got somebody that mite need something |
| AUSMORE | ANDERSON | Like 20 mins |
| ANDERSON | AUSMORE | Sanford brobro |
| ANDERSON | AUSMORE | Just call me |

Immediately after the text message exchange above, AUSMORE made an outgoing call from the AUSMORE 1394 Facility to the ANDERSON 8109 Facility and spoke with ANDERSON.  During the conversation, AUSMORE told ANDERSON, "Yeah, I'ma hit you, I'm at the mall though"—meaning that AUSMORE would contact ANDERSON when he wanted to pick up a supply of heroin.

63.    On or about October 10, 2018, TAYLOR received an incoming call from the AUSMORE 1394 Facility and spoke with AUSMORE.  AUSMORE requested that TAYLOR send him a picture of particular bricks of heroin.  Specifically, AUSMORE said:  "Send me that picture of them bricks with the green wrapping on it.  I'm trying to show these papis, tryin' to say this the shit I got."  TAYLOR agreed to do so and, thereafter, sent AUSMORE a photograph of a large number of packages (consistent with bricks of heroin) wrapped in green wrapping.

**VICEY**

64.    Numerous communications intercepted over the TAYLOR 6655 Facility revealed VICEY's active participation in the drug-trafficking conspiracy.  Some of these communications are described in paragraphs 65 through 71, below.

65.    Between on or about August 17, 2018 and on or about August 18, 2018, TAYLOR and VICEY had multiple conversations, during which they discussed when a new supply of heroin would arrive.  In one conversation

31

(in which VICEY used the VICEY 7210 Facility), TAYLOR told VICEY that PAPI was "holding on to the bomb [*i.e.*, heroin] until I give, I gotta give him two more racks," meaning $2,000. VICEY asked, "Alright, you want me to give you everything I got, how much I got?", and TAYLOR responded, "Yeah." TAYLOR also said that he had approximately $1,400, and VICEY told TAYLOR that he would give TAYLOR "the rest."

66.    In another telephone conversation on or about August 18, 2018, TAYLOR said that he was "waiting on the shit"—referring to the heroin that PAPI was supposed to supply. VICEY asked TAYLOR when "that shit [was] going to land." TAYLOR responded, "It was supposed to land yesterday, but he [PAPI] wanted ten more thousand or some shit"—meaning $10,000. Moments later, VICEY said, "Alright, I'm just chilling. Just call me whenever that shit lands, I don't care. Is that shit going to land early tonight or early—" TAYLOR interrupted, "Probably like around two or three, no later than five." VICEY responded, "Alright, when it do land I'm going to try to bring some money to you, that what I'm trying to do right now." Later that evening, after PAPI supplied TAYLOR with approximately 130 bricks of heroin, TAYLOR called the VICEY 7210 Facility, but VICEY did not answer.

67.    On or about August 21, 2018, TAYLOR received an incoming call from the VICEY 7210 Facility and spoke with VICEY. VICEY said that he was waiting on a "trap to come through," and that he then would bring TAYLOR money thereafter. VICEY also informed TAYLOR that the heroin packages with a "McDonalds" stamp were not good, but that he would pick more up from TAYLOR if that was all that TAYLOR had. TAYLOR instructed VICEY to bring the money at that time.

68.    On or about September 2, 2018, TAYLOR received an incoming call from the VICEY 7210 Facility and spoke with VICEY. TAYLOR questioned VICEY, in sum and substance, how VICEY was out of bricks already but only had given TAYLOR $1,500. TAYLOR said that VICEY should have given him $3,700, and instructed VICEY to call him when VICEY arrived in the area.

69.    On or about September 7, 2018, during a telephone conversation between TAYLOR and ROBERTS, TAYLOR informed ROBERTS that VICEY had spoken directly to PAPI, and that PAPI tried to sell VICEY 150 bricks of heroin, which ROBERTS and TAYLOR had previously returned to PAPI because they believed it was of poor quality. ROBERTS stated, "Pop wilin', yo, he is too thirsty [greedy], yo. I'm glad I gave that shit back so he don't be asking bitch for no money." Shortly thereafter, TAYLOR received an incoming call from the VICEY 7210 Facility and spoke with VICEY. VICEY asked if TAYLOR had said anything to PAPI about "the 150"—referring to the 150 bricks of heroin that PAPI had supplied. TAYLOR told VICEY that he had told ROBERTS. VICEY then said, "Pop [*i.e.*, PAPI] said not to say nothing, I told you because it's you. I told him you were guessing." VICEY also said that he liked the heroin

supplies with "Golden State" stamps, and TAYLOR said, "I'm about to bring you these five," meaning five bricks. Two days later, on or about September 9, 2018, TAYLOR called the VICEY 7210 Facility and spoke with VICEY, who confirmed that PAPI had given him (VICEY) another 100 bricks of heroin bearing a green ink stamp that read, "Monster." VICEY also said that he had not received any "complaints on that shit yet."

70.     On or about September 11, 2018, TAYLOR and ROBERTS had a telephone conversation during which they discussed their belief that PAPI was at that time supplying different groups in Trenton. TAYLOR stated, "That n***a dealing with mad people now," and ROBERTS agreed, saying, "He done burned his own self, I ain't gonna say shit." ROBERTS also noted that he had spoken to VICEY about PAPI: "I gave [VICEY] the motherfucking blueprint. I said, listen Vice, from day one, get you some items, this shit don't last forever. You know I got old boy, this n***as shit high as hell. I'm trying to stay in tune with him until that other thing comes [referring to a different supplier]. Pop on some sneaky shit, word up. I ain't gonna cross a motherfucker though. N***a been good to a motherfucker, I ain't gonna cross him."

71.     On or about September 21, 2018, TAYLOR received an incoming call from the ROBERTS 8686 Facility and spoke with ROBERTS. During the conversation, TAYLOR and ROBERTS discussed, among other things, additional heroin that PAPI had agreed to supply, and that PAPI had requested additional money. Specifically, TAYLOR indicated that PAPI "told me to bring him another two," meaning $2,000, and ROBERTS said that he had told PAPI "to have a hundred ready for you," meaning 100 bricks of heroin. ROBERTS then suggested, in sum and substance, that TAYLOR apply pressure to PAPI to supply high-quality heroin as soon as possible. In doing so, ROBERTS referred to a supply of heroin that PAPI had provided to VICEY: "But don't trust him [*i.e.*, PAPI] 'cause that's how he goin', like he gonna feel like he wanna keep the hundo. Give him the money but you're the one in a rush because the work, the other work that work that he gave Vice [*i.e.*, VICEY], that shit is fire bro."

### LEARY

72.     Communications intercepted over the COUNCIL 7893 Facility revealed LEARY's membership and participation in the drug-trafficking conspiracy. Some of these communications are described in paragraphs 73 through 77, below.

73.     As described in paragraph 53, above, on or about August 25, 2018, COUNCIL and LEARY had a telephone conversation in which LEARY asked COUNCIL to provide some "bars," meaning prescription pills. Specifically, LEARY wanted COUNCIL to "front" 50 pills to LEARY to re-distribute. Thereafter, LEARY said to COUNCIL, "Listen, man, if B-Money [*i.e.*, PHELPS] go, you gotta step up, MVP." LEARY continued, telling COUNCIL, "My man,

listen, B-Money [PHELPS] go, you the oldest, man you gotta step up, MVP.
If you ain't do it, just move out the way, let me get the reigns.  Let me be MVP
man, let me step up for the team.  B-Money go, you in charge."

74.   During the same conversation, LEARY and COUNCIL discussed the
quality of prescription pills that were being distributed at that time.
For example, COUNCIL discussed certain green-colored pills that he had at
that time; COUNCIL explained that he was having difficulty selling them,
because his customers were saying "they ain't right, man."  LEARY responded,
"[What are you] talking about, they still gonna buy 'em. . . .  Bitch is a criminal,
what the fuck you think, I'm a pharmacist?"

75.   On or about September 4, 2018, COUNCIL received an incoming
call from the LEARY 8155 Facility and spoke with LEARY.  During the
conversation, COUNCIL and LEARY discussed various issues related to the
conspiracy's ongoing drug trafficking, including law enforcement's arrest of
another co-conspirator, not named as a defendant herein, who had been
arrested in possession of heroin.  COUNCIL and LEARY also discussed the
possibility of LEARY selling to COUNCIL bricks of heroin for "80 dollars just to
get it out of my hands."  COUNCIL responded, in sum and substance, "Bitch,
next time you get it, just let me know."

76.   On or about September 7, 2018, COUNCIL received an incoming
call from the LEARY 8155 Facility and spoke with LEARY, at which time LEARY
told COUNCIL about a potential pill supply.  Specifically, LEARY told
COUNCIL, "Somebody got 40 Dilaudid pills."  COUNCIL asked, "Which ones is
it?"  LEARY then handed the telephone to a female not named as a defendant
herein.  The female told COUNCIL that she was willing to sell the Dilaudid pills
to COUNCIL for $20 per pill, and that they were "strong as hell."  COUNCIL
agreed to obtain from the female a quantity of the pills.

77.   On or about October 11, 2018, TAYLOR received an incoming call
from the COUNCIL 7893 Facility and spoke with COUNCIL.  COUNCIL told
TAYLOR that "Buck [i.e., LEARY] said call him," and that LEARY was "trying to
grab or something"—meaning obtain heroin.  Shortly thereafter, TAYLOR
received an incoming call from the LEARY 8155 Facility and spoke with LEARY.
During the conversation, LEARY asked TAYLOR, "Hey, yo, O [i.e., COUNCIL]
told you to call me, right?"  TAYLOR said, "Yeah."  LEARY then said that he had
some individuals who wanted to "holla at" TAYLOR because TAYLOR "got some
fire."  In other words, LEARY wanted to introduce to TAYLOR individuals who
wanted to purchase heroin from TAYLOR.  LEARY also asked about the
packages of heroin that TAYLOR had; TAYLOR said that he had "Death Row,"
"Cut Throat," "Monster," and "24-7," and that the stamps on those packages
were red and purple in color.  TAYLOR agreed to meet LEARY so that TAYLOR
could speak to the prospective purchasers himself.

*ANDERSON*

78.     Numerous communications intercepted over the TAYLOR 6655 Facility and the AUSMORE 1394 Facility revealed ANDERSON's membership and participation in the drug-trafficking conspiracy.  Some of these communications are summarized in paragraphs 79 through 85, below.

79.     On or about August 16, 2018, TAYLOR received an incoming call from the ANDERSON 7419 Facility and spoke with ANDERSON.  During the call, ANDERSON chastised TAYLOR for not answering the phone.  TAYLOR responded, "Bitch, I was asleep."  ANDERSON then said, "You can't be sleepin.' Listen, money don't go to sleep, Jak."  TAYLOR responded, "Man, bitch, I'm rich already," and ANDERSON said, "You corny ass n***a, you gonna help me get rich."  Thereafter, TAYLOR agreed to supply ANDERSON with seven bricks of heroin.

80.     On or about August 22, 2018, TAYLOR had multiple conversations with ROBERTS, who used the ROBERTS 2557 Facility.  For example, during one call, TAYLOR advised ROBERTS that he (TAYLOR) was waiting on "Maj"— *i.e.*, ANDERSON—"for the last couple dollars for the old shit"—meaning that he was waiting on ANDERSON to give TAYLOR the proceeds from the sales of heroin packages, so that TAYLOR could give money to ROBERTS to give to PAPI for additional supplies of heroin.  During another call, ROBERTS asked TAYLOR if he (TAYLOR) had spoken to PAPI and TAYLOR said that he had not. TAYLOR continued, stating that he was "waiting on this shit from Maj, man, Maj talking about he was done, now I'm calling his phone, his phone off."

81.     On or about September 1, 2018, TAYLOR received an incoming call from the ROBERTS 2557 Facility and spoke with ROBERTS.  During the conversation, TAYLOR and ROBERTS discussed, among other things, obtaining money to give to PAPI, as PAPI had been requesting.  TAYLOR stated, "I'm trying to round up all the money.  He, Pop, he gotta be patient, man, like bitch, like—" ROBERTS interjected, stating that PAPI "keep texting me, tell him I be up top, we want go up there really quick or whatever.  So, alright, um, he just gonna have to wait and shit, 'cause I got a couple dollars, but he, he gotta wait."  TAYLOR then said, "Bitch, I still gotta grab from Maj, Vice, bitch, I got mad people I gotta grab from."  In other words, TAYLOR explained to ROBERTS that other co-conspirators, including ANDERSON, VICEY, and others, owed TAYLOR money for prior supplies of heroin that TAYLOR had provided.  Later during the conversation, TAYLOR also said, "Like bitch, there's mad people, Maj [ANDERSON] should, Maj probably the only [one] who's probably gonna be done, bitch.  I just gave VICEY 50 yesterday."

82.     On or about October 1, 2018, TAYLOR made an outgoing call to the ANDERSON 8109 Facility and spoke with ANDERSON.  During the conversation, ANDERSON asked TAYLOR, in sum and substance, to obtain

bricks of heroin bearing an ink stamp that read, "Milk." TAYLOR and ANDERSON discussed how many ANDERSON could "handle," meaning how many bricks ANDERSON could sell in two days. ANDERSON first said, "Give me 30," meaning bricks of heroin. TAYLOR responded, "You ain't handle no 30 in two days"—meaning that TAYLOR did not think ANDERSON could dispose of 30 bricks of heroin in two days. ANDERSON acknowledged as much, and ultimately said, "Give me 20, give me 15, give me 15, I can do that in two days." TAYLOR agreed, and met ANDERSON to supply him with the agreed-upon quantity of heroin.

83.     Later that day, ANDERSON sent a text message from the ANDERSON 8109 Facility to the TAYLOR 6655 Facility that read, "Yo was only 12"—meaning only 12 bricks of heroin rather than the agreed-upon 15. Thereafter, ANDERSON and TAYLOR had multiple telephone conversations to discuss the issue. For example, in one conversation, ANDERSON said, "I'm checking this shit, all of 'em was in there. Listen, they're taped, all of them was in rows of four, they not in rows of five, Jak, and it was only three rows in there, only twelve bricks, you have to gimme three extra bricks." TAYLOR disagreed: "Listen Maj, listen Maj. . . . I counted them, I counted them right there, my n***a, I counted them, bitch, one, two, three, she, I gave her fifteen packs bro, said there's fifteen. I counted them, they was in rows of five, n***a, they was in rows of five, bro. It was three rows, it was three rows, three rows of five." Shortly thereafter, TAYLOR sent a text message to the ANDERSON 8109 Facility that read, "On my kids it was 15 uncle i wouldnt do u like that," meaning that TAYLOR would not intentionally give ANDERSON less than the fifteen bricks upon which they had agreed.

84.     On or about October 4, 2018, TAYLOR received an incoming call from the ANDERSON 8109 Facility and spoke with ANDERSON. During the conversation, TAYLOR and ANDERSON discussed how much money ANDERSON owed to TAYLOR for heroin that TAYLOR had supplied. Referring to the three bricks of heroin discussed in paragraph 83, above, ANDERSON also said, "I told you I'm going to give you 12 for the 15, I was gonna take the loss of the three and give you a whole 12." ANDERSON and TAYLOR then discussed, in sum and substance, TAYLOR providing additional heroin to ANDERSON once ANDERSON had paid TAYLOR for the earlier supply. TAYLOR said, "When I get back I'ma put that other stuff together for you," and ANDERSON said, "That's what I'm saying, just call me once you're done I'll come right to you."

85.     On or about October 7, 2018, law enforcement observed TAYLOR meet with ANDERSON on Sanford. Thereafter, TAYLOR had a telephone conversation with another female, during which TAYLOR told the female that he had to meet with someone that owed him money. Thereafter, TAYLOR received a call from the ANDERSON 8109 Facility and spoke with ANDERSON. During the conversation, ANDERSON said that he thought he had given

TAYLOR $700: "I had 800 on me, that's what I'm say—860.  I kept the 160, that's why when I counted it I was like, there, I gave him 25 twenties, I gave you 25, I gave you 25 twenties, that's 500.  And then I counted the other 200 off."  TAYLOR re-counted the money, and told ANDERSON that he had only received $580.   ANDERSON then said, "Alright, cool, no problem, then, that ain't no problem," and agreed to give TAYLOR the remainder at a later time.

**BUSH**

86.    At all times during the conspiracy, BUSH was incarcerated at Bayside State Prison, located in or around Leesburg, New Jersey.  On or about October 4, 2018, TAYLOR received an incoming call from BUSH, with whom he spoke for approximately 16 minutes.  During the conversation, BUSH agreed with TAYLOR to engage in large-scale heroin distribution upon his release from prison, and BUSH and TAYLOR discussed, in detail, specific aspects of their future activities together.  This call is described in paragraphs 87 through 92, below.

87.    During the call, TAYLOR told BUSH, in sum and substance, that he had met a new supplier who had given him "two hundred dollars"— in context, 200 bricks of heroin.  BUSH told TAYLOR to "hold on to all them shits, I got a few lined up, too."  BUSH also warned TAYLOR multiple times to be "slow motion" and "be strong out there"—meaning to be careful and avoid the suspicion of law enforcement.  BUSH said that TAYLOR had to "be there" when BUSH got home, and that he (BUSH) had been "lining things up"— meaning making arrangements to engage in narcotics distribution upon his release from prison.  BUSH encouraged TAYLOR "to just hold on."  BUSH also suggested that TAYLOR take a "vacation," and warned TAYLOR not to wait to get arrested to "pull out, regroup" rather than to "wait for something to happen or some bullshit to happen."  TAYLOR agreed, and said he was about to "get low anyway next week."

88.    During the call, TAYLOR also told BUSH about a particular "young boy," whom TAYLOR intended to "bring in" to the conspiracy.  BUSH warned TAYLOR not to "bring him in on the peoples"—meaning that TAYLOR should not introduce the individual to TAYLOR's drug suppliers.  TAYLOR agreed, stating, "Naw, hell no, I ain't bringin' him in like that, hell no."  BUSH also warned, "Don't trust nuttin."

89.    During the call, TAYLOR and BUSH also discussed the quality of the heroin supplies that TAYLOR was obtaining, and the price for which he was obtaining and re-distributing them.  TAYLOR explained that he was "letting them go for 100 dollars"—meaning he was selling heroin for $100 per brick.  TAYLOR continued, explaining said that "my peoples chargin' me 75 cent," and that he was "letting them go for a dollar, 11 dollars."  In other words, TAYLOR was paying $75 per brick to his supplier, and re-selling bricks of heroin for

$100 or $110.  BUSH responded, "Aight, that sound like a plan."  TAYLOR also explained to BUSH, in sum and substance, that he had met another supplier who wanted to charge TAYLOR "85 cents"—meaning $85 per brick.  Despite the higher cost, TAYLOR said, that supplier's "material is better" than TAYLOR's existing supplier.  Finally, TAYLOR explained that the new source had been distributing heroin to many individuals in and around Trenton, but that TAYLOR had told the supplier that he no longer needed to do so, because the supplier had "hit the jackpot" by meeting TAYLOR.

90.     During the call, BUSH also advised TAYLOR to install "boxes" in the vehicles that TAYLOR uses to distribute narcotics—meaning trap compartments used to secrete contraband.  TAYLOR agreed, telling BUSH that he was in the process of installing a trap in one of his vehicles, and that he was planning on purchasing a van in which a trap also would be installed.  BUSH said that TAYLOR needed to get the van "trapped out" because when he (BUSH) got home from prison, "things are going to get crazy."

91.     During the call, BUSH also asked who TAYLOR's close associates were.  TAYLOR claimed to have a "small little circle" of associates, and that he "let them do everything; I just collect."  BUSH advised TAYLOR to require his associates to give TAYLOR "half on that"—meaning that TAYLOR should require his associates to pay him half, up front, for supplies of heroin that TAYLOR provided.  This way, BUSH explained, TAYLOR would not have to bear the entire risk if something went wrong with a particular supply.  And, BUSH advised, if an associate did not pull his weight, he would need to be "clipped"—meaning that his supply of heroin would be cut off.  That way, BUSH explained, TAYLOR would build loyalty with his associates, and would decrease the risk that his associates would abandon TAYLOR in the future.  Specifically, BUSH—referring to TAYLOR's associates—said, "If you gonna be part of the circle, bitch, everybody gotta build."  TAYLOR agreed, and said, "That's real shit, that's real shit, though."  BUSH responded, "I know.  I'm only gonna give you the real shit, bro.  I'm only gonna give you that shit.  You know I got this shit mastered, man."  TAYLOR also told BUSH, "You know I'm with you one hunnit [hundred], bitch, I been with you one hunnit [hundred]."

92.     At the end of the call, BUSH said, "I'm back, bitch, I'm here."  BUSH again told TAYLOR that he needed to "hold on" until BUSH came home from prison.  BUSH said that TAYLOR needed to be "out there," and that TAYLOR needed to "just hold on":  "I just need you to hold on to them peoples"—meaning drug suppliers.  BUSH then said that "I got some other shit lined up, just hold on.  Just be out there.  I don't give a fuck if you got to put something up and go get a job, bitch.  Just be out there, n***a."  TAYLOR agreed to do so.

**WIMBUSH, WILLIAMS, WEST, and WELCH**

93.     On or about September 6, 2018, officers conducting surveillance in and around Trenton observed a vehicle registered to WIMBUSH parked on the street.  Officers then observed an individual, later identified as WILLIAMS, exit a nearby building carrying a plastic bag.  WILLIAMS got in the front passenger's seat of the car, which then remained parked for about two minutes.

94.     Law enforcement conducted an investigatory stop of the vehicle and its four occupants, WIMBUSH, WILLIAMS, WEST, and a juvenile passenger.  During a subsequent search of the vehicle, officers identified a "trap" compartment designed for secreting contraband, and recovered, among other things, (i) a .223 caliber semi-automatic assault rifle; (ii) a Glock 30 .45 caliber semi-automatic firearm, bearing serial number GBE230; (iii) a Smith & Wesson .40 caliber semi-automatic firearm, model SD4VE, bearing serial number FZF7667; (iv) a Glock 19 semi-automatic firearm, bearing serial number FDF181; (v) dozens of rounds of ammunition of various caliber; and (vi) approximately 57 bricks of suspected heroin bearing ink stamps that read, "Golden State," "Kawasaki," "Remi Martin," and "Capital One."  The investigation revealed, based on numerous communications intercepted over the TAYLOR 6655 Facility, that TAYLOR and his co-conspirators distributed during the conspiracy heroin packages bearing "Golden State," "Kawasaki," and "Capital One" ink stamps.

95.     Following the seizure of the firearms and suspected heroin, law enforcement intercepted a number of communications over the TAYLOR 6655 Facility revealing, among other things:  (i) that TAYLOR supplied some of the suspected heroin found in the car; (ii) that he "fronted" WIMBUSH and WIMBUSH's associates heroin; and (iii) that TAYLOR, WELCH, and others were aware of the assault rifle in the vehicle.  Some of these intercepted communications are described in paragraphs 96 through 102, below.

96.     On or about September 6, 2018, TAYLOR called a telephone number ending in 9688 and spoke to a female not named as a defendant herein.  During the conversation, TAYLOR asked the female, "You see how they got Young Money [WIMBUSH] flipped on Hoffman?"  TAYLOR went on, "Bitch, it's like somebody told or something, bitch, they had that car, they searching that car for like an hour and a half, no exaggeration, yo, they been searching that car."

97.     Shortly thereafter, TAYLOR called the WELCH 8441 Facility and spoke with WELCH.  During the conversation, WELCH and TAYLOR discussed the stop of WIMBUSH's vehicle.  TAYLOR said, "They didn't find nothing, though, right?"  And WELCH answered, "They going to, they didn't find—" and TAYLOR interrupted, "Yeah, that's what I'm sayin', I was about to tell you,

bitch." WELCH informed TAYLOR, "I'm mad as hell, though, I wanna tell you what's in that, bitch, what's in that car, there's about four hand things"—meaning firearms—and TAYLOR said, "Bitch, I already know." WELCH then said, "And there's some packs in there, bitch, probably like, like 80 in there"—meaning that there were also 80 bricks of heroin in the vehicle. TAYLOR asked WELCH whose name the car was registered under, and WELCH said "it's in my brother's name," referring to WIMBUSH. Later during the conversation, TAYLOR also said, "Bitch, that's federal"—meaning that federal law enforcement likely would take notice. WELCH also told TAYLOR, in sum and substance, that she would continue to distribute narcotics, because "I still gotta eat and stuff, I just gotta move smart"—meaning that she would need to distribute narcotics carefully to avoid law enforcement's attention. However, WELCH continued, "I'm still gonna be doing shit, I'm telling you now"—meaning distributing narcotics in furtherance of the conspiracy.

98. Thereafter, TAYLOR received a call from a telephone number ending in 2970 and spoke to a male regarding the stop of WIMBUSH's vehicle. During the conversation, TAYLOR said to the male, "They didn't find nothing in the car, bitch, but they took it, bitch, you know they gonna search it when they get there."

99. Thereafter, TAYLOR received a call from the ROBERTS 2557 Facility and spoke with ROBERTS. During the conversation, TAYLOR told ROBERTS, "Bitch, they just locked Young Money whole team up, just today, bitch, they found five guns, bitch 80 bricks of dope, bitch."

100. The next day, on or about September 7, 2018, TAYLOR called the WELCH 8441 Facility and spoke with WELCH. During the conversation, WELCH told TAYLOR, "They found, like, eight poles [guns] and like, 80 packs." TAYLOR responded, "They didn't find that big bitch"—referring to the assault rifle. WELCH corrected him: "Yes they did, that was in there. But that's what I told him, I said, when you around with that"—referring to the assault rifle—"you don't need nothin' else," referring to additional handguns.

101. The next day, on or about September 8, 2018, TAYLOR received a call from a telephone number ending in 2970 and spoke with an unidentified female, who then conferenced in an unidentified male via a three-way call. During the conversation, TAYLOR told the male and female about the car stop and firearms seizure, and the male asked, "What was in the car?" TAYLOR responded, "I'm saying, the car, that shit had stash boxes in there and shit. They found the stash boxes, you feel me, found eight, 75 packs, and eight guns, A-R and like seven handguns."

102. As described in paragraph 36, above, on or about September 10, 2018, TAYLOR received a call from a telephone number ending in 3311, and spoke for 24 minutes with an unidentified male. During the conversation, in

addition to discussing TAYLOR's ongoing heroin distribution, TAYLOR and the male discussed the firearms and heroin that had been seized from WIMBUSH's vehicle. During the conversation, TAYLOR told the male, "Yeah, a couple of those bricks in there was mine. I was fronting all of them, they whole team." Later during the conversation, the male mentioned heroin packages bearing "Capital One" stamps that were being sold at that time in Trenton, and TAYLOR confirmed, in sum and substance, that he was the source of "all" of the packages bearing Capital One stamps. As noted in paragraph 94, above, some of the bricks of heroin seized from WIMBUSH's vehicle bore "Capital One" stamps.

103. During the same conversation described in paragraphs 36 and 102, above, TAYLOR and the unidentified male also discussed WELCH's participation in the drug-trafficking conspiracy. TAYLOR told the male, "KiKi got a phone," meaning that WELCH had obtained multiple customers to whom she could sell heroin. TAYLOR continued, telling the male, "She down 40 packs, she down 40 packs in two days"—meaning that WELCH regularly was able to sell 40 bricks of heroin in two days. The male then asked TAYLOR, "You talking about Young Money's [WIMBUSH's] sister?" TAYLOR responded, "Yeah," and continued, stating, "I just be dumping them packs on her."

104. Indeed, also on or about September 10, 2018, TAYLOR and WELCH had a telephone conversation during which TAYLOR told WELCH, "Gucci, Obsession, and Grand Theft Auto," referring to stamps on available packages of heroin. WELCH then stated, "Grand Theft Auto and Gucci," referring to the particular packages of heroin that she wanted TAYLOR to supply. TAYLOR said, "Alright," and WELCH said, "I'm gonna call you when I get back around there." Later that day, TAYLOR and WELCH had another telephone conversation during which TAYLOR told WELCH that he "got them shits put up for you," referring to the supply of heroin they had discussed earlier. WELCH said that she would get them later.

**_HALL_**

105. Numerous communications intercepted over the TAYLOR 6655 Facility revealed HALL's active participation in the drug-trafficking conspiracy. Some of these communications are described in paragraphs 106 through 115, below.

106. On or about August 10, 2018, TAYLOR received an incoming call from the HALL 0762 Facility and spoke with HALL. During the conversation, HALL said that he was holding "a rack"—meaning $1,000. HALL told TAYLOR about upcoming supplies of heroin which, HALL said, would be identified by the ink stamps "Durango," "Kawasaki," and "Grandstand." HALL and TAYLOR then continued to discuss, in sum and substance, the quality and pricing of various packages of heroin.

107.   On or about August 11, 2018, TAYLOR called the HALL 0762 Facility and spoke with HALL.  During the conversation, TAYLOR said that he was "trying to move these shits"—referring to bricks of heroin.  TAYLOR continued, telling HALL that "my Papi [i.e., PAPI] bout to give me another hundred today, I got a hundred yesterday.  Yeah, I'm trying to move these shits and then, spend some money with your peoples and see if he gonna front me some more shit.  I got some shit called Obsession right now."  TAYLOR and HALL then discussed the quality of the heroin, and TAYLOR stated that the "Golden State" is better.  Referring to the "Golden State" stamps, HALL said, "I got 17 packs left of that shit."

108.   On or about August 13, 2018, TAYLOR received a call from an co-conspirator not charged as a defendant herein.  During the conversation, the male asked TAYLOR about the "Golden State" heroin packages.  Referring to HALL, TAYLOR said that "Buddha got it."

109.   On or about August 17, 2018, TAYLOR called the HALL 0762 Facility and spoke with HALL.  During the conversation, TAYLOR said, in sum and substance, that he needed $3,000 as payment for prior heroin that had been supplied to HALL.  HALL told TAYLOR that "Young Money"— i.e., WIMBUSH—was seeking to obtain heroin from HALL.  TAYLOR told HALL that PAPI had started "asking for mad bread out of nowhere," and TAYLOR expressed his belief that PAPI was "playing around with the money" that TAYLOR was giving to PAPI.  TAYLOR also indicated to HALL that the next supply of heroin would bear the stamps "Uber" and "Capital One."  HALL asked TAYLOR how long it would take to obtain "seven"—meaning 700 bricks.  TAYLOR said that it would be about ten days or two weeks.

110.   On or about August 30, 2018, TAYLOR received a call from the HALL 0762 Facility and spoke with HALL.  HALL said, "Hit me when you come out so I can grab some, some of that shit"—referring to bricks of heroin.  HALL also asked about the quality of that supply:  "That's the good ones right?", and TAYLOR answered, "Yeah."  HALL asked, "What's the name of them?"  TAYLOR answered, "Uh, Empire and, uh, Empire and, fucking Capital One."

111.   On or about September 2, 2018, TAYLOR called the HALL 0762 Facility and spoke with HALL.  During the conversation, HALL asked if TAYLOR had "a lot of them shits"—meaning bricks of heroin.  HALL ultimately asked TAYLOR to supply him with twenty bricks of heroin, and TAYLOR agreed to do so.

112.   On or about September 6, 2018, TAYLOR called the HAMPTON 7110 Facility and spoke with HAMPTON.  TAYLOR and HAMPTON discussed, among other things, money that HALL owed to TAYLOR for heroin that TAYLOR

had supplied. Specifically, TAYLOR said that HALL owed him "$3,000 plus 20 bricks that I gave him." TAYLOR also stated that HALL "fucked the money up" by losing drug proceeds while gambling. Shortly thereafter, TAYLOR called the HALL 0762 Facility and spoke with HALL. During the conversation, HALL said, "I need some shit"—referring to heroin. TAYLOR asked HALL, "How many you going to give me," and "How many you got left?" HALL answered, "Like 120"— meaning 120 bricks of heroin. TAYLOR said, "Bitch, give me like forty of them shits. Thirty to forty of them shits. What you got, Golden State?" HALL answered, "Yeah."

113. On or about September 7, 2018, TAYLOR called the WELCH 8441 Facility and spoke to WELCH. During the conversation, WELCH informed TAYLOR that another individual had "whacked Buddha"—meaning that the individual had absconded with heroin supplies from Buddha without paying for them. WELCH stated, however, that "it wasn't a lot, though." TAYLOR asked, "How much?" "I think it was fifteen"—meaning fifteen bricks of heroin. TAYLOR stated that HALL "owe me 3,000 and 20"—meaning $3,000 and 20 bricks of heroin.

114. Later that day, TAYLOR called the HALL 0762 Facility and spoke with HALL. HALL and TAYLOR discussed HALL returning a supply of fifteen bricks of heroin that TAYLOR previously had supplied. TAYLOR agreed to take back the bricks from HALL. Thereafter, TAYLOR and HALL discussed money that TAYLOR believed HALL owed him. During the argument, HALL referred to the individual who had left the state without paying for the heroin that HALL had supplied. Specifically, HALL said that the individual had left town with approximately 25 bricks of heroin, and that the individual had "ten Kawasaki and fifteen of yours." In another telephone call that day, TAYLOR and HALL agreed that HALL would pay TAYLOR in money and heroin. Specifically, HALL stated that he would pay TAYLOR "400 and five packs"—meaning $400 and five bricks of heroin.

115. On or about September 20, 2018, TAYLOR received a call from the HALL 0762 Facility and spoke with HALL. During the conversation, HALL asked TAYLOR, "You still got some of them shits, right"—referring to bricks of heroin. TAYLOR said that he did, and HALL said that he needed "fourteen," and would meet with TAYLOR shortly thereafter.

**HAMPTON**

116. Communications over the TAYLOR 6655 Facility revealed HAMPTON's membership and participation in the conspiracy. Some of these communications are described in paragraphs 117 through 123, below.

117. On or about August 10, 2018, TAYLOR received an incoming call from the HAMPTON 9459 Facility and spoke with HAMPTON. During the call,

TAYLOR said, "I'm waiting for old boy, that shit about to land"—referring to a supply of heroin.  TAYLOR said, "I don't want to be on the highway with that shit, sitting with that shit."

118.   Later that day, TAYLOR called the HAMPTON 9459 Facility and again spoke with HAMPTON.  During the conversation, HAMPTON said that he kept his "stash" with his "girl," but that he needed to move it, and that he mostly kept supplies for "hand-to-hands" at that particular location—meaning small-quantity narcotics transactions.  TAYLOR responded that the "other girl" was going to "line you up"—meaning set HAMPTON up or steal from him.  TAYLOR then referenced another stash location at which HAMPTON kept a larger supply of heroin with another female.  With respect to "the other girl," TAYLOR said that "she could have taken the 140 packs"—meaning 140 bricks of heroin.  HAMPTON said, "I would have killed that bitch," and TAYLOR responded, 'That's what you would have had to do, then."

119.   On or about August 11, 2018, TAYLOR called the HAMPTON 9459 Facility and spoke with HAMPTON.  During the conversation, HAMPTON asked TAYLOR, "What the name you got?"  TAYLOR responded, "Obsession and Golden State"—referring to the ink stamps on the packages of heroin that TAYLOR had at that time.  HAMPTON responded that he wanted "five or ten of Golden State."  Shortly thereafter, TAYLOR called the HAMPTON 9459 Facility and informed HAMPTON that he no longer had any heroin with the "Golden State" stamp.  HAMPTON asked what the name of the other stamp was, and TAYLOR responded, "Obsession."

120.   On or about August 13, 2018, TAYLOR received an incoming call from the HAMPTON 9459 Facility and spoke with HAMPTON.  HAMPTON asked where TAYLOR was, and said that he wanted to purchase ten bricks of heroin from TAYLOR.  TAYLOR told HAMPTON where he was, and HAMPTON said that he would "be coming around."  Later that day, TAYLOR called the HAMPTON 9459 Facility and again spoke with HAMPTON.  During the conversation, HAMPTON asked, "What's the name of the new, the one I just got, that green one?"  TAYLOR responded, "No I got Versace now."  HAMPTON responded, "That's the green one?  I'm talking about the one you just gave me."  TAYLOR then said, "Oh, no, that's called Obsession."

121.   On or about August 18, 2018, TAYLOR received an incoming call from one of his heroin customers, who asked about packages of heroin bearing several different stamps, including "Frank Lucas," "Golden State," and "Black Panther."  TAYLOR told the customer, "the Frank Lucas blue stamp, that's over, that was my shit."  Thereafter, in another communication, TAYLOR agreed to sell the customer heroin bearing a blue "Blank Panther stamp."  Approximately four minutes later, TAYLOR called the HAMPTON 9459 Facility and asked HAMPTON where he was, because TAYLOR needed to "come get a pack of the blue 'Black Panther.'"  Thereafter, TAYLOR sent a text message to

the HAMPTON 9459 Facility that read, "Wya [where you at] my trap bout to be here."  TAYLOR and HAMPTON then exchanged a series of text messages and telephone calls, during which HAMPTON agreed to sell, on TAYLOR's behalf, the "Black Panther" heroin packages to TAYLOR's customer, as well as a quantity of crack cocaine.

122.   On or about August 22, 2018, TAYLOR received an incoming call from the HAMPTON 9459 Facility and spoke with HAMPTON.  HAMPTON asked, "What's the name of that shit?"  TAYLOR responded, "Uber" and "McDonalds"—referring to the stamps on the heroin packages that he had available.  HAMPTON asked for TAYLOR to "put five and five together" for him—meaning five bricks of each stamp, and TAYLOR agreed.

123.   On or about August 30, 2018, TAYLOR had a telephone conversation with CHESTON in which CHESTON agreed to supply TAYLOR with one or more firearms.  (That conversation is described in paragraph 165, below.)  Approximately 3½ hours later, TAYLOR received an incoming call from the HAMPTON 9459 Facility and spoke with HAMPTON.  During the conversation, TAYLOR told HAMPTON that the "situations"—referring to the firearms to be supplied by CHESTON—were "on their way."  HAMPTON replied, "Oh yeah, them poles [firearms]?  Oh, that's love."

### BRANDON COUNCIL

124.   Communications intercepted over the COUNCIL 7893 Facility revealed BRANDON COUNCIL's membership and participation in the conspiracy.  Some of these communications are described in paragraphs 125 through 130, below.

125.   As described in paragraph 59, above, on or about August 31, 2018, OMAR COUNCIL and AUSMORE had a telephone conversation in which AUSMORE informed COUNCIL of an available cocaine supply.  Immediately after that call, COUNCIL called the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL.  During the conversation, OMAR COUNCIL informed BRANDON COUNCIL of the cocaine supply and offered cocaine to BRANDON COUNCIL.  Thereafter, OMAR COUNCIL and BRANDON COUNCIL agreed to meet.

126.   On or about September 4, 2018, OMAR COUNCIL received an incoming call from the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL.  During the conversation, OMAR COUNCIL and BRANDON COUNCIL discussed, among other things, being careful to avoid law enforcement.  OMAR COUNCIL advised BRANDON COUNCIL, "There's so much shit goin' on, man, but you know, man.  Just like I said, you know how to move, you feel me?  No lacking, that's all, and no time.  That means you gotta

get you a cleaner car.  Something you ain't got to worry about getting pulled over in, and all tight and shit."

127.   On or about September 22, 2018, OMAR COUNCIL received an incoming call from the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL.  OMAR COUNCIL asked, "You ever get your hands on that other thing you used to have?"  BRANDON COUNCIL asked, "Hard, [unintelligible]?"  OMAR COUNCIL responded, "Soft," meaning powder cocaine.  BRANDON COUNCIL then said, "Yeah, but I'm cooking that stuff"—meaning converting the powder cocaine into crack cocaine.  OMAR COUNCIL then said, "Bitch I need that shit.  You got something now?"  BRANDON COUNCIL said, "I got hard," meaning crack cocaine.  OMAR COUNCIL then said, "Nah, I don't need none of that.  Bitch, I don't play with that.  I'm probably gonna need a couple from you anyway.  I was just about to hit you, where you at?"  BRANDON COUNCIL then said, "What you need, some bricks, some packs?"— referring to heroin.  OMAR COUNCIL responded, "Yeah, I need a couple of them, got the dude coming," and told BRANDON COUNCIL to meet him later.

128.   The next day, on or about September 23, 2018, OMAR COUNCIL called the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL.  During the conversation, COUNCIL said, "I might need a couple, where you at?"  BRANDON COUNCIL responded, "What you talking about, D?"—meaning heroin.  OMAR COUNCIL confirmed that he was seeking to obtain heroin from BRANDON COUNCIL.  The following day, on or about September 24, 2018, OMAR COUNCIL again called the BRANDON COUNCIL 7401 Facility and told BRANDON COUNCIL, "I need a couple, two"—referring to bricks of heroin.  BRANDON COUNCIL said that he was at his house and OMAR COUNCIL said that he would go over there at that time.

129.   On or about September 26, 2018, local law enforcement executed search warrants at BRANDON COUNCIL's residence and other locations, as well as for his person and his vehicle, in connection with BRANDON COUNCIL's drug trafficking in and around Trenton.  Law enforcement did not locate any contraband in connection with these searches.  However, on or about September 27, 2018, OMAR COUNCIL received an incoming call from the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL about, among other things, the searches and law enforcement's activities more generally.  OMAR COUNCIL warned BRANDON COUNCIL that he needed to "chill out man, nef, you movin' too reckless, nef."  OMAR COUNCIL also told BRANDON COUNCIL, "You know what they looking for"—referring to narcotics and/or firearms.  BRANDON COUNCIL bragged, "I'm not stupid, I ain't stupid, bro.  You see they hit everything and they didn't find shit."  OMAR COUNCIL responded that "All you need to do is get one more thing and you'll be stuck in the fucking building somewhere"—meaning prison.  OMAR COUNCIL continued: "You feel me, bitch, and then you can't fight, you can't do shit from in the motherfucking building.  You got to chill, nef. . . .  You got to find a way

46

to move, bitch, and not be in no shit."  Referring to law enforcement, BRANDON COUNCIL responded, "I'm ten steps ahead of them."

130.   The following day, on or about September 28, 2018, OMAR COUNCIL received an incoming call from the BRANDON COUNCIL 7401 Facility and spoke with BRANDON COUNCIL.  BRANDON COUNCIL asked OMAR COUNCIL to ride with him in his new vehicle, and OMAR COUNCIL replied, "I ain't fucking with you, bitch, 'til you chill out."  BRANDON COUNCIL responded, "Damn' yo, I'm chillin.  They ain't find nothing, bitch, ain't nothing goin.  They been followin' me for two weeks.  They hit all the spots that they say we go to, bro.  They ain't catch, I ain't goin like that, man, you feel me?  I ain't goin; nothing.  I'm getting my place.  They ain't never catch me with them.  Soon as I get it, it's gone, bitch."

### ROCK

131.   Numerous communications intercepted over the TAYLOR 6655 Facility revealed ROCK's membership and participation in the drug-trafficking conspiracy.  Some of these communications are summarized in paragraphs 132 through 142, below.

132.   On or about August 10, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR informed ROCK that the "Frank Lucas" stamp had become "Golden State."  ROCK asked if TAYLOR had "all Golden State," and TAYLOR said that he did.  ROCK then asked TAYLOR for "three"—meaning bricks of heroin.  TAYLOR informed ROCK, in sum and substance, that he would be charging ROCK a higher price than he previously had charged, and that TAYLOR would charge $90 per brick.  Later that day, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR informed ROCK that he now had packages of heroin bearing the ink stamps "Obsession" and "Scarface."

133.   On or about August 13, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, ROCK said, "He ain't got that other shit," and TAYLOR asked, "Which one?"  ROCK responded, "Golden State."  TAYLOR then said, "Buddha [i.e., HALL] got it."  ROCK asked, "Buddha got that stuff?", and TAYLOR confirmed that HALL had those packages of heroin.

134.   On or about August 14, 2018, TAYLOR and ROCK had multiple conversations regarding supplies of heroin.  In one conversation, ROCK called TAYLOR and said, "I need two packs [i.e., bricks of heroin] real quick," and TAYLOR said, "Alright."  In another conversation a few hours later, ROCK called TAYLOR and asked, "You at the spot?", and TAYLOR answered, "Yeah."  ROCK then said, "Alright I need five"—meaning bricks of heroin.

135.   On or about August 16, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR asked ROCK to give him a brick of heroin, and told ROCK, in sum and substance, that he was out of heroin supplies at that time, but that he was "waiting for that order I put in"—meaning that TAYLOR was waiting for the arrival of a new supply of heroin.

136.   On or about August 19, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR and ROCK discussed, in sum and substance, another co-conspirator who was having difficulty selling his supply of heroin.  TAYLOR noted that that co-conspirator "had that same bomb"—meaning heroin supply—"for like a month now."  TAYLOR also noted that the individual "don't got no weight falling."  Thereafter, ROCK asked TAYLOR, in sum and substance, if he had a heroin supply available, and TAYLOR said that he did.  ROCK asked, "What's the name of it?"—referring to the ink stamp on the packages.  TAYLOR answered, "I got the same shit."

137.   On or about August 23, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, ROCK asked TAYLOR for "ten right quick"—meaning bricks of heroin.  TAYLOR agreed, and told ROCK to meet him at a particular location.  TAYLOR also mentioned to ROCK that he (TAYLOR) had served "a 20-packer at 160 a pack"—meaning that he had sold twenty bricks of heroin to a drug customer at $160 per brick.

138.   On or about August 27, 2018, TAYLOR called the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR said, in sum and substance, that the sample of heroin that TAYLOR had given ROCK was "like an eight or nine"—referring to the heroin's quality.  TAYLOR also said that the sample did not contain fentanyl in it, and he added that "it's all D, ain't no cut in it yet"—meaning that it was pure heroin.  ROCK then said that he was "about to have my trap do it"—meaning have his drug customer test the sample.

139.   On or about August 30, 2018, TAYLOR called the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR directed ROCK, in sum and substance, to give him "a rack"—meaning $1,000.  TAYLOR also told ROCK that "I got like 40 packs for you" of "the new shit"—referring to 40 bricks of heroin from a recent supply.  ROCK asked what the new supply was named, and TAYLOR answered, "Empire and—it's the shit I gave you that day.  It's Empire and Capital One."  TAYLOR also said, "I ain't giving it to you just to have, bitch"—meaning that TAYLOR wanted ROCK to pay him for the heroin.  TAYLOR also reiterated, "I need a rack now, bitch."

48

140.   On or about September 6, 2018, after the arrest of WIMBUSH, WILLIAMS, and WEST, as described in paragraphs 93 through 102, above, TAYLOR called the ROCK 3260 Facility and spoke with ROCK.  TAYLOR informed ROCK about the arrest, and said that "KiKi"—*i.e.*, WELCH—told TAYLOR that there were "80 bricks and six guns in the car" in which WIMBUSH, WILLIAMS, and WEST were arrested.

141.   On or about September 12, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, TAYLOR said that he had "some fire called Hot Sauce and First Down," and that the price was $110 per brick.

142.   On or about October 5, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility and spoke with ROCK.  During the conversation, ROCK asked TAYLOR for "the name of that shit"—referring to heroin packages. TAYLOR responded that he had packages bearing ink stamps that read "Death Row" and "Hot Sauce."  ROCK asked which was better, and TAYLOR answered, "They both fire, bro."  ROCK then said, "Alright, give me Death Row." TAYLOR agreed to do so.  The next day, on or about October 6, 2018, TAYLOR received an incoming call from the ROCK 3260 Facility, and ROCK asked for "five more of the Death Row."  Subsequent communications between TAYLOR and ROCK revealed that they agreed to meet to execute the delivery.

### *BINGHAM*

143.   Communications intercepted over both the COUNCIL 7893 Facility and the TAYLOR 6655 Facility revealed BINGHAM's active participation in the drug-trafficking conspiracy.  Some of these communications are described in paragraphs 144 through 153, below.

144.   On or about August 14, 2018, COUNCIL received an incoming call from the BINGHAM 9508 Facility and spoke with BINGHAM.  During the conversation, BINGHAM and COUNCIL discussed, among other things, the availability of various narcotics, including heroin and crack cocaine. BINGHAM relayed to COUNCIL that he (BINGHAM) had purchased, on or about the day before, "oil" (*i.e.*, cocaine) from one individual, and had obtained "dope" (*i.e.*, heroin) from another individual.  During the conversation, COUNCIL advised BINGHAM to "lay low and stay out of the way"—meaning to be careful and avoid law enforcement's attention.

145.   A short time later, COUNCIL received an incoming call from the BINGHAM 9508 Facility and spoke with BINGHAM again.  During the conversation, COUNCIL and BINGHAM continued to discuss, among other thing, the distribution of heroin.  In sum and substance, BINGHAM told COUNCIL that "there is plenty of dope money out there"—meaning that there was money to be made selling heroin.  BINGHAM continued, telling COUNCIL

that he (BINGHAM) had sold a brick of heroin since BINGHAM had spoken to COUNCIL earlier, and that he (BINGHAM) did not have heroin at that time. COUNCIL told BINGHAM that BINGHAM should have said something and he (COUNCIL) would have "dropped you off something"—meaning heroin.

146.   On or about August 14, 2018, COUNCIL received an incoming call from the BINGHAM 9508 Facility and spoke with BINGHAM.  During the conversation, COUNCIL and BINGHAM discussed issues relating to various narcotics, including heroin, cocaine, prescription pills, and marijuana.  Among other things, BINGHAM told COUNCIL that he had obtained "dope"—heroin—from a particular individual the other day, and that individual's stash house was a "gold mine."  BINGHAM also informed COUNCIL that another individual told him (BINGHAM) that "Papis love me," and that BINGHAM had "all the Papis on [his] phone."  COUNCIL warned BINGHAM to "stay low and stay out of the way," and mentioned that "Lito"—i.e., COX—was "mad as hell," as a result of his arrest a few days earlier, as described below.

147.   On or about August 16, 2018, COUNCIL called the BINGHAM 9508 Facility and spoke with BINGHAM.  During the conversation, COUNCIL asked BINGHAM if BINGHAM had any "oil," meaning cocaine.  BINGHAM said he then had available about a "gram."  COUNCIL asked BINGHAM to supply a particular quantity of cocaine.

148.   On September 4, 2018, BINGHAM and COUNCIL had a brief telephone conversation during which they discussed the sale of narcotics. Specifically, COUNCIL told BINGHAM that he had "D"—meaning heroin—and BINGHAM stated that he would "get with" COUNCIL in "a little bit."  The next day, on or about September 5, 2018, BINGHAM and COUNCIL had a telephone conversation, during which BINGHAM told COUNCIL, in sum and substance, that BINGHAM had found a supplier who was willing to supply him heroin for $100 per brick.  The following day, on or about September 6, 2018, BINGHAM called COUNCIL and informed him that the night before he had been arrested "with 45 bags of dope, man"—referring to heroin.  (BINGHAM had, in fact, been arrested the night before in possession of approximately 45 bags of suspected heroin.)  COUNCIL responded, "What you calling my phone, man?"  On or about September 8, 2018, COUNCIL called the AUSMORE 0699 Facility and spoke with AUSMORE.  During the conversation, AUSMORE asked COUNCIL, "Yo, you know Pop (i.e., BINGHAM) shot got knocked off with 45 bags the other night?"  And COUNCIL responded, "Yeah."

149.   On or about September 21, 2018, COUNCIL received an incoming call from the BINGHAM 9508 Facility and spoke with BINGHAM.  During the conversation, BINGHAM asked COUNCIL, "What you going to do with the dope?"  COUNCIL responded, in sum and substance, that he had to "find someone to do this shit for him," and that he (COUNCIL) wanted to do it that evening, but if not he would have to do it another day.

150.   Approximately nine minutes later, COUNCIL sent a text message to TAYLOR advising TAYLOR to "[c]all Fresh" at the BINGHAM 9508 Facility. Shortly thereafter, TAYLOR received a call from the BINGHAM 9508 Facility and spoke with BINGHAM.  During the conversation, BINGHAM advised TAYLOR that "I had needed some, I needed like five, but I had got it now, but I'm about to store you in [my telephone].  I'm gonna hit you."  TAYLOR said, "Alright."

151.   Thereafter, on or about September 24, 2018, COUNCIL and TAYLOR had a telephone conversation, during which COUNCIL asked TAYLOR if he (TAYLOR) had "ever called Fresh the other day?"  TAYLOR responded that he had spoken with BINGHAM.  COUNCIL explained that BINGHAM "needed the money," and TAYLOR said that "somebody wanted five"—referring to bricks of heroin.  During that conversation, COUNCIL and TAYLOR also discussed BINGHAM and other associates' ongoing narcotics distribution from "the little spot over there" in a particular neighborhood in or around Trenton.  COUNCIL and TAYLOR also discussed BINGHAM's recent arrest, in which, COUNCIL noted, "Fresh got knocked with a brick."

152.   The following day, on or about September 25, 2018, BINGHAM and COUNCIL had a telephone conversation, during which BINGHAM explained that he "need[ed] 'D,'" meaning heroin.  BINGHAM further said that "I need some good dope, though, that's why I asked you for Jak's number that day.

153.   On or about September 28, 2018, COUNCIL received an incoming call from the BINGHAM 9508 Facility and spoke with BINGHAM for approximately 24 minutes.  During the conversation, BINGHAM said that he had some "fire" (*i.e.*, heroin) with a stamp that read, "Black Jack," and he and COUNCIL then discussed various topics related to narcotics distribution.  Later during the conversation, COUNCIL said that he was about to "get some fire," and that he wanted to "lock in" with whoever had the "fire."

**WADE**

154.   During the investigation, law enforcement intercepted communications over the TAYLOR 6655 Facility revealing WADE's membership in the conspiracy.  Some of these communications are summarized in paragraphs 155 through 161, below.

155.   On or about August 8, 2018, TAYLOR received an incoming call from the WADE 2928 Facility and spoke to WADE.  During the conversation, TAYLOR and WADE discussed, in sum and substance, bricks of heroin bearing a "Frank Lucas" stamp; TAYLOR asked WADE, "How many you wanted?" WADE responded, "Five of them," meaning five bricks.  TAYLOR then told WADE to give him ten or fifteen minutes, and WADE responded, "Alright."

156.   On or about August 10, 2018, TAYLOR received an incoming call from the WADE 2928 Facility and spoke with WADE.  During the conversation, TAYLOR informed WADE that "the name changed.  It's called, uh, Obsession and Golden State"—referring to a new supply of heroin bearing different ink stamps, which TAYLOR had recently obtained from PAPI.  WADE asked, "What color are they?," and TAYLOR answered, "Golden State red and Obsession green."  WADE then said, "Alright, let me get, uh, let me get three and three of them shits.  Three of one and three of the other."  TAYLOR then agreed to bring the six bricks of heroin to WADE at WADE's residence.

157.   On or about August 13, 2018, TAYLOR received an incoming call from the WADE 2928 Facility and spoke with WADE.  WADE asked TAYLOR, "You still got Obsession, right?"  TAYLOR responded, "Yeah, I got a couple of them shits," referring to bricks of heroin.  TAYLOR continued, "I got the Obsession, Golden State, and Versace."  TAYLOR explained that despite the different stamps, "They all the same shit. . . .  The Versace and the Obsession is the same shit and the Golden State is the same thing as Frank Lucas."  WADE then said, "Alright, let me get, uh, five of them.  Two Golden State, two of the Versace, and then one of that, uh, Obsession."  TAYLOR agreed, and shortly thereafter TAYLOR and WADE met to conduct the transaction.

158.   On or about August 15, 2018, TAYLOR received an incoming call on the TAYLOR 6655 Facility from the WADE 2928 Facility and spoke with WADE. WADE told TAYLOR that he (WADE) wanted to grab "three of them McDonalds," referring to particular heroin packages, and TAYLOR responded that he only had two bricks left.  WADE agreed to purchase those two bricks and he and TAYLOR agreed to meet shortly thereafter.  In the interim, TAYLOR called WADE back and informed WADE that he (TAYLOR) had "three of them," again referring to bricks of heroin bearing a "McDonalds" stamp.  The following day, on or about August 16, 2018, WADE sent a text message from the WADE 2928 Facility to TAYLOR that read, "Yo bro u don't have nuttin different they don't like that shit," referring the dissatisfaction that WADE's drug customers had with the "McDonalds" stamp.  TAYLOR responded with a text message that read, "Waitimg [sic] on it bro," meaning that TAYLOR was awaiting another supply of heroin.

159.   Over the next several days, TAYLOR and WADE exchanged the following text messages:

| Date | Sender | Recipient | Message |
|------|--------|-----------|---------|
| August 17, 2018 | WADE | TAYLOR | Shit came thru |
| August 17, 2018 | TAYLOR | WADE | Not yet tom |
| August 19, 2018 | WADE | TAYLOR | Still ain't nuttin |
| August 19, 2018 | TAYLOR | WADE | Goldenstate red |
| August 19, 2018 | WADE | TAYLOR | I need 3 of them |

Approximately four minutes after the last text message listed above, TAYLOR received an incoming call from the WADE 2928 Facility and spoke with WADE. WADE asked TAYLOR for "three," meaning bricks of heroin, and TAYLOR agreed.  Subsequent telephone calls between TAYLOR and WADE confirmed that WADE purchased the requested bricks of heroin with a "Golden State" stamp.

160.   On or about September 10, 2018, TAYLOR sent a text message from the TAYLOR 6655 Facility to the WADE 2928 Facility that read, "Gucci and gta and obsession"—referring to bricks of heroin that TAYLOR had available to sell.  Shortly thereafter, TAYLOR received an incoming call on the TAYLOR 6655 Facility from the WADE 2928 Facility and spoke to WADE.  In sum and substance, WADE asked TAYLOR for a brick of heroin and informed TAYLOR that he (WADE) would come to TAYLOR's location.  Approximately three minutes later, WADE called TAYLOR and informed TAYLOR that he (WADE) was outside.

161.   On or about September 12, 2018, TAYLOR received an incoming call from the WADE 2928 Facility and spoke with WADE.  During the conversation, TAYLOR told WADE that he had the "old shit," which TAYLOR would sell to WADE for the same price.  Specifically, TAYLOR stated the had had "Gucci, Grand Theft Auto, and Sleepwalker" for the same price.  But, TAYLOR said, he also was willing to sell to WADE, for $105 per brick, packages of heroin bearing a "Hot Sauce" stamp, and TAYLOR said that that product was "super fire."  WADE then ordered two bricks of "Grand Theft Auto" packages. TAYLOR then said that he would give WADE the "other" heroin for "100"— meaning that he was willing to give WADE the "Hot Sauce" packages for $100 per brick.  Approximately eight minutes later, WADE called TAYLOR and said that he (WADE) was "on Coolidge."

***CHESTON***

162.   Communications intercepted over the TAYLOR 6655 Facility revealed CHESTON's role in the drug-trafficking conspiracy, namely, as a supplier of firearms.  On or about September 8, 2018, law enforcement arrested CHESTON at the Trenton Transit Center after he traveled from in or around North Carolina to in or around New Jersey for the purpose of selling to TAYLOR one or more firearms.  Following CHESTON's arrest, law enforcement recovered a nine-millimeter Smith & Wesson semi-automatic firearm, model SD9VE, bearing serial number HFA8598, from CHESTON's backpack.

163.   Before the arrest, based on communications between TAYLOR and CHESTON intercepted over the TAYLOR 6655 Facility, law enforcement learned that CHESTON agreed to provide at least one firearm to TAYLOR in exchange for approximately 15 bricks of heroin that TAYLOR previously had provided to CHESTON, and for additional heroin that TAYLOR agreed to provide to CHESTON in the future.  Some of the pertinent communications with respect to this arrangement are summarized in paragraphs 164 through 171, below.

164.   On or about August 25, 2018, TAYLOR received an incoming call from the CHESTON 8737 Facility and spoke with CHESTON.  During the conversation, TAYLOR told CHESTON, in sum and substance, that he (TAYLOR) was looking to obtain "at least" ten firearms, and that he specifically wanted a "handgun."   CHESTON responded that whatever firearms he was able to acquire he would bring to TAYLOR first.

165.   On or about August 30, 2018, TAYLOR received an incoming call from the CHESTON 8737 Facility and spoke with CHESTON.  During the call, CHESTON stated multiple times that he was going to bring TAYLOR a "Kel-Tec with a stick on it," referring to a particular type of firearm with an extended magazine.  TAYLOR responded that he did not care what type of firearms CHESTON provided, as long as they were "handguns."  Specifically, TAYLOR said, "I'm sayin', bitch, handguns are, bitch, all I wanted . . . .  A handgun, 380 [caliber], bitch, it could be with a stick on it, bitch, it could be anything, I don't give a fuck."  CHESTON responded, "Alright, alright, alright, I got you, then."

166.   On or about September 3, 2018, TAYLOR received an incoming call from the CHESTON 8737 Facility and spoke with CHESTON.  CHESTON informed TAYLOR that he (CHESTON) "was trying to get a ticket for this weekend but there was no tickets coming up that way until after Labor Day, so I am trying to make it up there Thursday.  I was trying to call you to let you know what was going on and shit."  CHESTON continued, telling TAYLOR that "That shit you got is a smoker, boy"—meaning that the heroin had supplied was high quality and popular with customers.  TAYLOR asked, "Which is the one I gave you?", and CHESTON responded, "Top Secret"—referring to packages of heroin bearing a particular ink stamp.  CHESTON then informed

TAYLOR that "I got you two good ones.  I got to, before I leave, I have to go in and get the sticks for them."  CHESTON then asked TAYLOR for more heroin: "Bitch, I need some more of that smoker, boy," and TAYLOR said, "Alright, I got you when you come back."

167.  On or about September 5, 2018, TAYLOR received an incoming call from the CHESTON 8737 Facility and spoke with CHESTON.  CHESTON informed TAYLOR that he had two firearms for TAYLOR:  "a 10 millimeter Smith & Wesson, and a 10 millimeter Glock," and that he was in the process of obtaining the "stick" for them as well.

168.  Thereafter, CHESTON and TAYLOR traded telephone calls, but did not connect.  On or about September 8, 2018, GPS location information for the CHESTON 8737 Facility revealed that CHESTON was traveling north from in or around North Carolina to in or around Philadelphia, Pennsylvania.  Law enforcement established surveillance and observed CHESTON arrive on a bus in or around Philadelphia.  Officers followed CHESTON onto a train bound for the Trenton Transit Center, and arrested CHESTON as he left the station.  Officers thereafter obtained a search warrant to search CHESTON's backpack, and located a nine-millimeter Smith & Wesson semi-automatic firearm, model SD9VE, bearing serial number HFA8598 and a magazine capable of holding fifteen rounds of ammunition.

169.  Following CHESTON's arrest, law enforcement intercepted numerous communications over the TAYLOR 6655 Facility in which TAYLOR discussed the circumstances of CHESTON's arrest with other individuals.  These conversations revealed that CHESTON believed that TAYLOR had set him up.  For example, on or about September 11, 2018, TAYLOR received an incoming call from the ROBERTS 2557 Facility and spoke with ROBERTS.  During the conversation, TAYLOR recounted the events to ROBERTS:

> I gave the n***a five packs [bricks], he was supposed to got me some shit [firearms] from down south.  So he went down there and came back, but he ain't never get them shits to me, gave them to somebody else.  So I seen him, I'm like damn, what happened my n***a?  He's like, 'Nah, long story, I gave such and such.'  So I wind up giving the n***a another ten [bricks of heroin], you feel me?  I'm like, 'Yo, just bring me three [firearms] back, you feel me?'  He like, 'Alright.'  So he supposed to came down here Friday, he get bumped off at the train station, he telling people in the county I set him up.

170.  Likewise, on or about September 12, 2018,  TAYLOR called AUSMORE on the AUSMORE 0699 Facility and told Ausmore about the circumstances of CHESTON's arrest.  During the conversation, Ausmore relayed to TAYLOR the information he had received regarding CHESTON's arrest.  Ausmore said that he had heard that "you [TAYLOR] put an order in

from [unintelligible] up north," meaning ordered firearms from CHESTON. TAYLOR then explained to AUSMORE that CHESTON believed that TAYLOR had set him up: "Yeah, he keeps telling people that I lined him up, like why the fuck would I line you up, my n***a, you owe me some fifteen packs"— meaning bricks of heroin. During the conversation, AUSMORE made the following observation: "Buying guns and shit from other parts of motherfucking states, bitch, that's federal, that's a federal conspiracy."

171.   On or about September 13, 2018, TAYLOR received a call from an unidentified female, who told TAYLOR that "Dennis" wanted to speak with him. Thereafter, the female conferenced in CHESTON, who proceeded to discuss with TAYLOR the circumstances of CHESTON's arrest. In sum and substance, CHESTON and TAYLOR discussed whether TAYLOR had informed law enforcement that CHESTON would be arriving in Trenton with a firearm. For instance, CHESTON said, "Jak, I don't know what you doing out there but you the last person I talked to. So if there's some type of big ass coincidence, you really need to think, like really, really think all the way through of what you said and to who you said it to." TAYLOR repeatedly denied having told anyone (including law enforcement) about CHESTON. Indeed, TAYLOR noted that he had given CHESTON heroin before CHESTON returned to North Carolina: "I gave you something [heroin], come on, my n***a, why the fuck would I do some shit like that [inform law enforcement]?" TAYLOR also asked CHESTON whether he was telling other inmates at the Mercer County Correctional Center (where CHESTON is detained) that TAYLOR had set him up; CHESTON denied having done so. CHESTON noted, "We both got some backtracking to do"—meaning that both he and TAYLOR had to go back to try and figure out who might have informed law enforcement about CHESTON's arrival with a firearm.

**_ELLIS_**

172.   During the investigation, law enforcement intercepted communications over the TAYLOR 6655 Facility that revealed ELLIS's membership and participation in the conspiracy. Some of these communications are summarized in paragraphs 173 through 180, below.

173.   In or around August 2018, ELLIS was released from prison in connection with a prior conviction. On or about September 2, 2018, TAYLOR received a text message on the TAYLOR 6655 Facility from his aunt that read "Donte Ellis home." Shortly thereafter, TAYLOR received an incoming call from the ROBERTS 2557 Facility and spoke with ROBERTS. ROBERTS told TAYLOR that he (ROBERTS) had "just met up with Shalant," *i.e.*, ELLIS. TAYLOR told ROBERTS that ELLIS had asked TAYLOR's aunt—the same aunt who had informed TAYLOR that ELLIS was "home"—for TAYLOR's telephone number.

174.   On or about September 17, 2018, law enforcement intercepted a call over the TAYLOR 6655 Facility between TAYLOR and another male then incarcerated at the Mercer County Correctional Center.  During the conversation, TAYLOR explained to the male, in sum and substance, that he (TAYLOR) intended to "unleash Shalant" on a particular neighborhood in Trenton.  TAYLOR stated further that "Shalant"—*i.e.*, ELLIS—"is like a sniper coming out of cuts and shit"—meaning that ELLIS would do well distributing TAYLOR's heroin supply.

175.   The same day, on or about September 17, 2018, TAYLOR called the ELLIS 6759 Facility and spoke with ELLIS.  During the conversation, TAYLOR and ELLIS discussed, in sum and substance, particular packages of heroin that ELLIS had and wanted to swap out.  TAYLOR asked if ELLIS had "fifteen," meaning fifteen bricks of heroin, and ELLIS responded that he had ten and some cash."  TAYLOR agreed to accept the ten bricks and cash from ELLIS and to give TAYLOR a new supply of fifteen bricks.

176.   On or about September 29, 2018, TAYLOR received an incoming call from the ELLIS 6759 Facility and spoke with ELLIS.  During the conversation, TAYLOR told ELLIS, "It's going to be a little later, but today though," referring to the timing of a new supply of heroin.  ELLIS and TAYLOR then agreed to conduct a heroin transaction later that day.

177.   Later that day, TAYLOR received an incoming call from the ELLIS 6759 Facility and spoke with ELLIS.  During the conversation, TAYLOR asked if ELLIS had already distributed the packages of heroin that ELLIS had last received from TAYLOR.  ELLIS stated, "I passed ten off already. . . ."  Referring to the color of the stamp on the packages that ELLIS had, TAYLOR then asked, "They was all green?  They was all green?"  ELLIS and TAYLOR confirmed that ELLIS was in possession of packages bearing a "Monster" stamp, and ELLIS asked if those packages were "good."  TAYLOR responded, "That's the one I got the most of. . . . I wanted you to have some of that, 'cause, you feel me, that's, that's what most of this shit is.  And once them people get hooked on it I want to be able to give it to you some more."  TAYLOR and ELLIS then continued discussing which stamps TAYLOR had previously given to ELLIS, and they confirmed that TAYLOR had given ELLIS heroin packages bearing ink stamps that read "Osama Bin Laden" and "Monster."  TAYLOR then continued:  "But I thought, but I thought I gave you all Bin Laden so I had wanted to give you some Monster 'cause, 'cause I just looked in the, I looked through the shit, and most of it is Monster.  It's all the same shit, it's  just different names. . . .  It's all the same shit, but you know, once they get hooked on a name, they be stuck on that name."

178.   On or about October 1, 2018, ELLIS sent a text message from the ELLIS 6759 Facility to the TAYLOR 6655 Facility that read, "CUZZO YOU AROUND?"  TAYLOR responded with a text message that read, "Yea."  ELLIS

then sent a text message that read, "I need 10 of that monster, got my ppl coming to pick it up"—referring to heroin packages bearing a "Monster" stamp. Shortly thereafter, ELLIS called TAYLOR and they continued their discussion. ELLIS informed TAYLOR, in sum and substance, that one of his (ELLIS's) associates had obtained from ELLIS ten bricks of heroin packages that ELLIS previously had, and that the associate would be returning to obtain another ten bricks of heroin from ELLIS, and that ELLIS would contact TAYLOR to obtain that supply.

179.   On or about October 6, 2018, TAYLOR and ELLIS had a telephone conversation, during which ELLIS asked TAYLOR the name of the stamp that would be on the next supply of heroin.  TAYLOR answered, "I don't know right off the top, but I'm just going to give you fifty of the same name"—referring to fifty bricks of heroin.  ELLIS then said, "Yeah, that's, yeah, but let me know the name as soon as you grab it so I, he [ELLIS's customer] want to know the name of it."  Thereafter, TAYLOR received a call from the ELLIS 6759 Facility and spoke with ELLIS.  TAYLOR informed ELLIS, in sum and substance, that he (TAYLOR) was on his way back with the supply of heroin, and that he would be back in about ten minutes.  TAYLOR also informed ELLIS that the name of the stamp on the heroin packages was "Cut Throat."  Approximately one hour later, ELLIS again called TAYLOR, and TAYLOR said that he had the heroin and that ELLIS could come pick up the fifty bricks and pay TAYLOR later.  Taylor also told Ellis, in sum and substance, that in addition to heroin packages with a "Cut Throat" stamp, Taylor had obtained additional supplies of heroin with packages that bore ink stamps that read "Monster" and "Death Row."

180.   On or about October 11, 2018, ELLIS had multiple telephone conversations with TAYLOR in which TAYLOR agreed to supply ELLIS with heroin.  In one call, ELLIS asked that TAYLOR "put 40 together," meaning 40 bricks of heroin," and TAYLOR agreed.  Subsequent communications between TAYLOR and ELLIS confirmed that they met at an agreed-upon location in or around Trenton.  Indeed, law enforcement officers conducting surveillance observed ELLIS meet with TAYLOR to obtain the supply of heroin. Officers subsequently arrested ELLIS in possession of approximately 40 bricks of suspected heroin bearing ink stamps that read "Cut Throat."  ELLIS was arrested and charged with narcotics offenses.

**WARNER**

181.   On or about May 14, 2018, WARNER, COUNCIL, LEARY, and AUSMORE were congregating on Mid-Rose which, as noted in paragraph 5, above, is a principal location for the drug-trafficking conspiracy's operations. WARNER was struck and seriously wounded by gunfire in a drive-by shooting that, upon information and belief, members of a rival neighborhood gang perpetrated.  During the investigation, law enforcement intercepted communications over the TAYLOR 6655 Facility and the COUNCIL 7893

Facility, during which WARNER and his co-conspirators discussed the shooting. These communications also revealed WARNER's membership and participation in the conspiracy. Some of these communications are summarized in paragraphs 182 through 187, below.

182. On or about August 9, 2018, COUNCIL received an incoming call from the WARNER 8604 Facility and spoke with WARNER. During the conversation, WARNER and COUNCIL discussed, among other things, the circumstances of the shooting that wounded WARNER, and the parties responsible for the shooting. COUNCIL said, "Still got to find out, bitch, who the fuck, you feel me"—meaning that they needed determine who was responsible for the shooting. WARNER agreed, stating, "Hell yeah, no, bitch got to find out who did that shit, now." WARNER also noted his desire to retaliate: "Bitch, I'll pull right up on a bitch, I don't give a fuck." Referring to the rival gang, COUNCIL said, "They happy that shit happened"—referring to the shooting. WARNER then noted his regret that he, COUNCIL, and other co-conspirators had not taken action before the shooting: "I know, I know. I'm tellin' you, bro, I know that's why we should've killed those n***as a long time ago, man." WARNER also said that he and his associates should have told another individual "with the shit, man go up there and take this gun and drop this whole fuckin' clip on that house"—referring to the rival gang. Finally, WARNER also suggested that his injury might "take me away from the D, though" and "might have happen to slow me down"—meaning that his injury might cause him to decrease or cease his heroin distribution in the future.

183. Shortly thereafter, also on or about August 9, 2018, TAYLOR called the WARNER 8604 Facility and spoke with WARNER. During the conversation, TAYLOR and WARNER discussed TAYLOR's ongoing heroin distribution, and WARNER provided advice to TAYLOR about those unlawful activities. WARNER said, "You got some shit goin on out there, bitch I gotta get out there"— meaning return to drug trafficking after his gunshot injury. WARNER advised TAYLOR to "get money, you in position, you got power." WARNER later advised TAYLOR to "watch out for n***as, you know n***as that you might have to kill one of these n***as nef," and also advised TAYLOR not to "let too many n***as in on your business, you in power right now, bitch." TAYLOR and WARNER then discussed the locations at which they could stash narcotics supplies. WARNER said that he got the spot, I got the low spot," which he said was "in the back, in the back, in the cut," and TAYLOR said that he had "this nasty ass stash spot for my shit"—meaning a good stash location. WARNER finally said to TAYLOR, "Keep going, I already know you know how to stack bread and get a position."

184. On or about August 22, 2018, TAYLOR received an incoming call from the WARNER 8604 Facility and spoke with WARNER. During the conversation, WARNER said that he needed TAYLOR for a "situation"—meaning

firearm—and that he would be going to his doctor's office for an appointment. TAYLOR said, "You ain't carry no poles on the doctor's thing, though." WARNER responded, "Hell yeah, word is bond.  Shit ain't funny, I be ready to blast a bitch."

185.   On or about September 6, 2018, TAYLOR received an incoming call from the WARNER 8604 Facility and spoke with WARNER.  During the conversation, TAYLOR and WARNER discussed, among other things, proceeds that each had earned selling heroin.  WARNER explained, in sum and substance, that he regretted having spent the narcotics proceeds that he previously had earned:  "I wish I would get smarter with my money, I was doing dumb shit with my paper.  Bitch was getting the money, like that wasn't the hard part."  WARNER described, in sum and substance, an earlier occasion in which he had obtained bricks of heroin from "B-Money" and "Fresh"— *i.e.*, PHELPS and BINGHAM—and gave them to another individual who, WARNER explained, "moved them for me."  WARNER described that heroin as "super fire"—meaning high quality.  WARNER also said that he had "talked to B [*i.e.*, PHELPS] earlier," and that "mad shit start happening to us, man."

186.   On or about September 12, 2018, TAYLOR received an incoming call from the WARNER 8604 Facility and spoke with WARNER.  During the conversation, TAYLOR said that he had sold "40 packs" and received "5600"— meaning 40 bricks of heroin for $5,600.  WARNER referred to another female heroin customer, to whom WARNER had regularly sold heroin during the conspiracy.  TAYLOR said, "Yeah, I got her now"—meaning that TAYLOR now was the customer's heroin supplier.  WARNER asked, "How you get here?" TAYLOR explained, "Remember the day you sent me to go serve her?  I gave her my number. . . .  She called me and told me that she was looking for you and I'm like, that's crazy, 'cause she called me the same day that shit happened to you"—meaning WARNER's gunshot wound.  TAYLOR continued, explaining that "I be givin' her bricks for $100," and that "she come every day."  WARNER agreed, saying that the female customer "kept a n***a alive"—meaning that she had been a regular heroin purchaser of WARNER.  TAYLOR then explained that he told the customer that he preferred not to deal in small quantities, but rather "I serve all weight"—meaning large quantities of heroin.  WARNER then asserted, in sum and substance, that he no longer was dealing heroin, "unless I get a weight trap, 200 bricks, 300 bricks, boom boom, like that."

187.   On or about September 14, 2018, COUNCIL called the WARNER 8604 Facility and spoke with WARNER.  During the conversation, WARNER asked COUNCIL to supply him with certain prescription pills, and COUNCIL said that he was saving those pills for other customers.  COUNCIL asked WARNER if WARNER would be coming out.  WARNER responded, "Alright, well, bring them gloves out, bitch, if I come out.  Bitch gotta bring all they glove— guns out."

**COX**

188.   As summarized in paragraphs 26 and 27, above, on or about August 10, 2018, ROBERTS supplied TAYLOR with approximately 100 bricks of heroin that PAPI had supplied to ROBERTS.

189.   After observing TAYLOR and ROBERTS meet, law enforcement officers conducting surveillance separately observed COX arrive in the area and get in ROBERTS's vehicle.  A short time later, COX got out of ROBERTS's vehicle with a large package under his shirt, went back to his car, and then re-approached the driver's side of ROBERTS's vehicle and handed ROBERTS cash while ROBERTS remained sitting in the driver's seat.  Based on this activity and the previously intercepted telephone communications over the TAYLOR 6655 Facility, law enforcement conducted a traffic stop of COX's vehicle (which resulted in a brief car chase), searched the vehicle, and recovered approximately 50 bricks of suspected heroin bearing "Obsession" and "Scarface" ink stamps—*i.e.*, the same packages of heroin that PAPI supplied to ROBERTS and TAYLOR.

190.   On or about August 14, 2018, TAYLOR received an incoming call from the ROBERTS 8686 Facility and spoke with ROBERTS.  During the conversation, ROBERTS referred to "Lito," *i.e.*, COX, and said that "this n***a telling motherfuckers that I set him up.  I'm frontin' this dumbass the work."

191.   On or about August 17, 2018, during the telephone conversation between TAYLOR and VICEY described in paragraph 65, above, TAYLOR explained to VICEY that he (TAYLOR) needed to pay PAPI $2,000, and that he had approximately $1,400 at that time.  TAYLOR said, "We're probably like 1400, cuz, I just didn't even tell him about Lito [*i.e.*, COX] got bumped off with like 50 packs, so that shit—"  VICEY interrupted, "Oh yeah, I know, he ain't tell them about that?", and TAYLOR answered, "Nah."  TAYLOR and VICEY then continued discussing collecting money to pay PAPI.

192.   On or about August 19, 2018, TAYLOR received an incoming call from the ROBERTS 8686 Facility and spoke with ROBERTS.  During the conversation, ROBERTS told TAYLOR, among other things, that he had taken a loss due to the arrest of "Lito," *i.e.*, COX.

**KOON**

193.   During the investigation, KOON conspired with PAPI and others to distribute and possess with intent to distribute heroin by, among other things, obtaining a large supply of suspected heroin from PAPI.  The circumstances of KOON's participation in the drug-trafficking conspiracy are set forth in paragraphs 194 and 195, below.

194.   On or about September 18, 2018, law enforcement conducted physical surveillance of PAPI at or around PAPI's residence at 820 Chambers Street in Trenton.  During the surveillance, officers observed PAPI exit 820 Chambers Street wearing a backpack and carrying two laundry bags and go inside a nearby laundromat.  Shortly thereafter, PAPI left the laundromat without the laundry bags, and then got in the rear passenger seat of a nearby minivan parked on the street, where he stayed for approximately three minutes.

195.   PAPI got out of the vehicle and went back inside 820 Chambers Street and the minivan drove away.  Officers followed the minivan and conducted a traffic stop.  During the stop, officers observed in plain view what appeared to be several bricks of heroin.  Thereafter, officers searched the vehicle and recovered approximately 58 bricks of suspected heroin bearing ink stamps that read "Seahawks," "Versace," and "Walking Dead," as well as quantities of suspected crack cocaine and marijuana, and a digital scale. The occupants of the vehicle were identified as KOON and another individual not named as a defendant herein.  KOON and the other individual were placed under arrest and charged with local narcotics offenses.  While in the police precinct for processing, KOON stated to officers that "everything" in the vehicle—*i.e.*, the narcotics and drug paraphernalia—belonged to him, and that the other individual did not "have anything to do with it."

**WHARTON**

196.   On or about August 13, 2018, ROBERTS agreed to (and did) supply TAYLOR with approximately 100 bricks of heroin that ROBERTS had obtained from PAPI.  WHARTON, acting on TAYLOR's behalf, agreed to and did pick up the supply from ROBERTS, and thereafter she delivered it to TAYLOR. Some of the communications relating to this transaction are summarized in paragraphs 197 through 202, below.

197.   In one call between TAYLOR and ROBERTS, ROBERTS asked, "You got the bitch with you, right?", referring to WHARTON.  TAYLOR responded, "Um, I was waiting on you to tell her to come."  ROBERTS then instructed TAYLOR to tell his female associate (*i.e.*, WHARTON) to meet ROBERTS at a park near a hospital in or around Trenton.  ROBERTS also asked TAYLOR whether TAYLOR would be coming with her, or if "she comin' by

herself." TAYLOR responded, "Yeah, I was gonna come, and then I was gonna grab the shit and have her meet me there."

198. Thereafter, TAYLOR called the WHARTON 5526 Facility multiple times and each time spoke with WHARTON. During the conversations, TAYLOR told WHARTON to meet him by the same park to which ROBERTS had directed TAYLOR. Specifically, TAYLOR told WHARTON that he needed her to meet "Righteous" (i.e., ROBERTS) in "the park . . . on the side of the hospital." WHARTON proceeded to that location, and in another conversation, TAYLOR told WHARTON that he would meet her at her house after she met with ROBERTS. WHARTON responded that there were "mad people" in her house. TAYLOR said, "Yeah, it don't matter, I just need, I'm comin' right there, though, I ain't leaving nothing up there," referring to WHARTON's residence.

199. Shortly thereafter, ROBERTS called TAYLOR to coordinate the pickup with WHARTON. During the conversation, TAYLOR said, "She in a gold car, some gold shit. You in, you in your shit, your silver shit?", referring to ROBERTS's silver Mercedes Benz sedan. ROBERTS said, "Yeah, I'm in my shit." In another call a few minutes later, TAYLOR directed ROBERTS to WHARTON's vehicle in the parking lot. During the call, ROBERTS informed TAYLOR that he "put a hundred in there, 'cause I had 150 but I need to hold this 50 real quick for, uh, somebody, but I'm gonna bring you your 50 back." TAYLOR responded, "Don't worry about it." ROBERTS and TAYLOR also discussed the stamps on that supply, specifically, "Versace" and "McDonalds," and ROBERTS noted that the "McDonalds" was fire."

200. Approximately two minutes later, TAYLOR called the WHARTON 5526 Facility and again spoke with WHARTON. TAYLOR asked WHARTON where she was, and WHARTON responded that she was "on 7th," and that she was about to go in the store and purchase cigarettes. TAYLOR then said, "How you doin' all this movin' when you know what's goin' on right now"—referring to the fact that WHARTON had just picked up approximately 100 bricks of heroin from ROBERTS. WHARTON responded, "Well, where you at?" TAYLOR then said, "No, but why are you [unintelligible]? That's what I'm sayin', go to the house, fuck." WHARTON said, "Alright."

201. Approximately fourteen minutes later, TAYLOR called the WHARTON 5526 Facility and again spoke with WHARTON. WHARTON informed TAYLOR that she was on her porch, and TAYLOR indicated that he believed law enforcement had been following him. WHARTON then said, "Well then don't come here." TAYLOR explained that he had left his car behind due to law enforcement's surveillance and that he was walking to her house, and he directed her to stay there. WHARTON agreed.

202.   Approximately 21 minutes later, TAYLOR called the WHARTON 5526 Facility and again spoke with WHARTON.  TAYLOR asked, "Yo, that bag fit in your pocketbook?", referring to the bag containing the 100 bricks of heroin that WHARTON had picked up from ROBERTS.  WHARTON responded, I'm right here, you see me?"  TAYLOR then said, "Yeah, but can that bag fit in your pocketbook?"  WHARTON answered, "It's like a Gap bag, nah, it's a big bag.  Like the last one."  TAYLOR then said, "Alright, bring it in the hallway," and WHARTON agreed to do so.